IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

J.E.C.M., a minor, by and through his next friend )
    JOSE JIMENEZ SARAVIA, et al., )
                               )
        Plaintiffs/Petitioners, )
                               )
    v. )       1:18-cv-00903 (LMB/MSN)
                               )
SCOTT LLOYD, Director, Office of Refugee )
    Resettlement, et al., )
                               )
        Defendants/Respondents. )

## MEMORANDUM OPINION

Plaintiffs/petitioners ("plaintiffs") in this putative class action[1] are four minors from

Central America designated as "unaccompanied alien children" who are, or who have been, in

the custody of the Office of Refugee Resettlement ("ORR") and the four sponsors who filed

family reunification applications on their behalf. Defendants/respondents ("defendants")[2] are the

minors' custodians and the officials responsible for administering ORR's policies with respect to

the detention and release of unaccompanied minors. Plaintiffs allege that defendants' policies

violate constitutional, statutory, and administrative law, and they seek declaratory and habeas

relief as well as attorney's fees and costs. Before the Court is defendants' motion to dismiss for

---

[1] Plaintiffs have filed two motions for class certification [Dkt. Nos. 5 and 28]. The Court has stayed both motions [Dkt. No. 20] pending resolution of defendants' motion to dismiss.

[2] Defendants are Scott Lloyd, Director of ORR; Jonathan White, Deputy Director of ORR; Natasha David, ORR Federal Field Specialist; Alex Azar, Secretary of the Department of Health and Human Services; Steven Wagner, Acting Assistant Secretary for the Administration for Children and Families; Johnitha McNair, Executive Director of the Northern Virginia Juvenile Detention Center; Timothy Smith, Executive Director of the Shenandoah Valley Juvenile Detention Center; and Gary L. Jones, Chief Executive Officer of Youth for Tomorrow.

lack of subject-matter jurisdiction and for failure to state a claim [Dkt. Nos. 35 and 36]. For the

reasons stated below, the motion will be granted in part and denied in part.

## I. BACKGROUND

### A. **Factual Background**[3]

1. **J.E.C.M.**

J.E.C.M. is a 13-year-old Honduran boy. While in Honduras, J.E.C.M. and his family

relied on his sister and his brother-in-law Jose Jimenez Saravia ("Jimenez Saravia"), who were

living in the United States, for support. Second Am. Class Action Compl. and Pet. for a Writ of

Habeas Corpus [Dkt. No. 21] ("Compl.") ¶¶ 90-91. He attended school and, despite living in a

violent area, was never involved in any crime. Id. ¶¶ 91-92. Fearing persecution, J.E.C.M. fled

Honduras in December 2017. Id. ¶¶ 90, 93. Upon reaching the United States in February 2018,

he was promptly apprehended by agents of the U.S. Customs and Border Protection ("CBP"),

initially placed in a San Diego shelter, and subsequently transferred to a "staff secure" ORR

facility in Washington state. Id. ¶¶ 93-94.

Jimenez Saravia completed a family reunification application on J.E.C.M.'s behalf.

Although J.E.C.M.'s case manager prepared an ORR Release Notification indicating ORR had

determined that J.E.C.M. should be released to Jimenez Saravia's custody, before J.E.C.M. could

be released, he was involved in a physical altercation with an ORR staff member. Compl. ¶¶ 95-

97. The staff member allegedly pushed J.E.C.M. into an emergency exit door, which opened and

---

[3] The following facts are drawn from the allegations in plaintiffs' complaint, which for purposes of deciding defendants' motion to dismiss the Court assumes to be true. In limited circumstances, the Court may also consider documents outside of plaintiffs' complaint without converting the motion to one for summary judgment. See Witthohn v. Fed. Ins. Co., 164 F. App'x 395, 396 (4th Cir. 2006) (per curiam); Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004).

sent J.E.C.M. "tumbl[ing] out." He fled the ORR facility, hiding in a trash can for hours until police discovered him and took him to jail. Id. ¶¶ 96-97. As a result of this incident, J.E.C.M. was classified as a "runaway" and sent to the Northern Virginia Juvenile Detention Center, a high-security ORR facility where he lived with older, "at-risk" children and "was the target of constant bullying." Id. ¶¶ 97-99.

Although J.E.C.M.'s case manager had recommended that he be released to Jimenez Saravia, ORR insisted that all adult members of Jimenez Saravia's household had to provide biographical and biometric information to be used for background checks. Compl. ¶ 100. Several members of the household were reluctant to do so, fearing that the information would result in immigration enforcement. Id. This delayed the processing of Jimenez Saravia's application. Id. ORR ultimately decided to waive the identification and fingerprinting requirements, and on July 26, 2018—less than a week after this action was filed—J.E.C.M. was released to Jimenez Saravia's custody. Id. ¶ 102; Memo. of Law in Opp'n to Pls.' Mot. for Class Certification Ex. A [Dkt. No. 19-1] ¶ 17. Altogether, J.E.C.M. spent approximately six months in ORR custody. Compl. ¶¶ 93, 102. He claims to have suffered anxiety and depression as a result. Id. ¶ 101.

2. R.A.I.

R.A.I. is 15 years old. Compl. ¶ 117. She was born in Honduras and from the age of five was raised by her sister, Sandra Alvarado ("Alvarado"). Id. Fleeing from violence in their community and seeking better educational opportunities, R.A.I. and Alvarado came to the United States in April 2018. Id. ¶ 118. The two were separated at the border; Alvarado, an adult, was released on her own recognizance, but R.A.I. was handed over to ORR and sent to Youth for Tomorrow, a "shelter care" facility in Virginia. See id. ¶¶ 45, 119.

Alvarado moved to Maryland and applied to regain custody of R.A.I. Compl. ¶ 120. Her application was delayed for months because her roommates refused to provide identification or fingerprints to ORR. Id. Alvarado ultimately moved into a new home with other siblings living in Maryland, all of whom were willing to provide such information. Id. ¶ 121. Although R.A.I. was in ORR custody when defendants filed their motion to dismiss, see Memo. of Law in Supp. of Defs.' Mot. to Dismiss [Dkt. No. 37] ("Defs.' Memo.") 10, she has since been released to Alvarado, see Reply Memo. of Law in Supp. of Defs.' Mot. to Dismiss [Dkt. No. 53] ("Defs.' Reply") 2. She had spent six to seven months in ORR custody.

3. K.T.M.

K.T.M. is a 15-year-old boy who fled his home country of Honduras with his older sister Wendy "to escape violent and credible threats on his life after his father was murdered in front of him." Compl. ¶ 124. They hoped to reunite with K.T.M.'s other sister, Cynthia Velasquez Trail ("Velasquez Trail"), who had moved to the United States a few years earlier and with whom K.T.M. had remained in close contact. Id. Upon their arrival in the United States in March 2018, K.T.M. and Wendy were separated; Wendy went to live with Velasquez Trail, while K.T.M. was sent to Youth for Tomorrow. Id. ¶ 125.

Velasquez Trail submitted a family reunification application on K.T.M.'s behalf, but her application was also delayed at the documentation stage. Compl. ¶ 126. Although all adult members of Velasquez Trail's household agreed to provide biographical and biometric information to ORR, Wendy could not attend her initial fingerprint appointment because U.S. Immigration and Customs Enforcement ("ICE") officials had confiscated her identification card at the border. Id. The application was ultimately completed in early August 2018, id. ¶ 126, and K.T.M. was released to Velasquez Trail's custody in late September of that year, Pls.' Memo. of

Law in Opp'n to Defs.' Mot. to Dismiss [Dkt. No. 41] ("Pls.' Opp'n") 7 n.13. He had been in ORR custody for six to seven months.

### 4. B.G.S.S.

B.G.S.S. is a 17-year-old boy who in May 2018 came to the United States from Guatemala "to escape persecution and because his mother had passed away." Compl. ¶ 103. While in Guatemala, B.G.S.S. attended school and kept in close contact with his sister Blanca Jeronimo Sis ("Jeronimo Sis"), who was living in the United States. Id. ¶¶ 104-05. He had never been arrested for or charged with any crime. Id. ¶ 105.

After he was apprehended in the United States, B.G.S.S. was placed in a small ORR shelter of about 50 minors, where staff began work on family reunification. Compl. ¶ 106. After only 10 days, B.G.S.S. was transferred to Casa Padre, which plaintiffs describe as a "warehouse of about 1,500 children, housed in a converted Walmart." Id. Plaintiffs allege that B.G.S.S. "became depressed, irritable, and hopeless" after being transferred to Casa Padre and that he received several "significant incident reports" for things he said to ORR staff or other detainees, including "inappropriate but false claims about his age and about past and future violence." Id. ¶¶ 106-09.[4] As a result, B.G.S.S. was sent to Shenandoah Valley Juvenile Center, a "secure" facility that "serves both as an ORR facility and as a juvenile jail for minors . . . who have been adjudicated delinquent." Id. ¶¶ 8, 109, 112.

---

[4] Plaintiffs allege that B.G.S.S. has since "consistently denied being an adult," "having committed violence in the past," or intending "to commit violence in the future." Compl. ¶ 111. They also aver that B.G.S.S.'s family verified his birth certificate and provided "plausible, age-appropriate explanations for his admittedly misguided but certainly not criminal false reports regarding his age and past." Id.

Jeronimo Sis, who lives in Virginia, filed a family reunification application seeking custody of B.G.S.S. Comp. ¶ 113. Although she had provided her own identification and fingerprints as part of that application, ORR informed her that the application was incomplete and that it would require such information from all adult members of her household, "including her adult daughter and her partner." Id. ¶¶ 113-14. Jeronimo Sis's partner was "fearful of providing his information to ORR to be shared with ICE and used for immigration enforcement." Id. ¶ 114. Her daughter was similarly uncertain. See id. ORR employees told Jeronimo Sis that the only ways she could proceed with her application were to submit her partner's and daughter's information or to live separately from them. Id. Her partner and daughter have since moved out of the family home so that the application process can proceed. See Pls.' Opp'n Ex. 3 [Dkt. No. 41-3] ("Jeronimo Sis Decl.") ¶¶ 11-13, 15.

B.G.S.S. remains in ORR custody. Defs.' Reply 7. In August 2018, he was transferred to a "staff secure" facility in Texas, and he has since been moved again, this time to a high-security juvenile jail in California. Pls.' Opp'n 7 n.13. Jeronimo Sis had previously completed her family reunification application on B.G.S.S.'s behalf, but B.G.S.S.'s new case manager recently informed her that she would have to resubmit all materials, including fingerprints. Jeronimo Sis Decl. ¶ 17. B.G.S.S. has now been in custody for approximately six months and alleges that he has experienced anxiety, depression, and stress. Compl. ¶¶ 108, 116.

**B. Statutory and Administrative Background**

Thousands of "unaccompanied alien children"—defined as minors with no lawful immigration status and no identifiable parent or legal guardian, 6 U.S.C. § 279(g)(2)—arrive in the United States each year. Compl. ¶ 37. Many, including plaintiffs, come from Central American countries experiencing "endemic levels of crime and violence." Id. Congress has

charged ORR, which is under the umbrella of the Department of Health and Human Services ("HHS"), with the responsibility of caring for and ultimately releasing such minors, and a number of statutory and administrative sources of law govern how ORR may go about that task.

1. The Flores Agreement

In the 1980s, unaccompanied minors in custody of the U.S. Immigration and Naturalization Service ("INS") brought a class action challenging their confinement. See D.B. ex rel. R.M.B. v. Cardall, 826 F.3d 721, 732 (4th Cir. 2016). After years of litigation, the parties entered into a court-approved settlement now known as the Flores Agreement. See id. The agreement, which "is binding on all successor agencies to the INS," including ORR, see id., "sets out nationwide policy for the detention, release, and treatment of minors" held in custody because of their immigration status. Defs.' Memo. Ex. A [Dkt. No. 37-1] ("Flores Agreement") ¶ 9.

The Flores Agreement obliges ORR to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Flores Agreement ¶ 11. It provides that ORR

> shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before . . . the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require [ORR] to release a minor to any person or agency whom [ORR] has reason to believe may harm or neglect the minor or fail to present him or her before the . . . immigration courts when requested to do so.

Id. The agreement establishes a "general policy favoring release": Where "detention of the minor is not required," ORR "shall release a minor from its custody without unnecessary delay." Id.

¶ 14 (capitalization altered). It also creates an order of preference governing to whom unaccompanied minors should be released.[5]

ORR may perform a "suitability assessment" to investigate "the living conditions in which the minor would be placed and the standard of care he would receive." <u>Flores</u> Agreement ¶ 17. That assessment may involve verifying the identity of the potential sponsors, interviewing members of the household, and conducting home visits. <u>Id.</u> ORR must consider "the wishes and concerns of the minor." <u>Id.</u> Further, ORR may not delay reunification; the <u>Flores</u> Agreement requires that it make "prompt and continuous efforts . . . toward family reunification and the release of the minor." <u>Id.</u> ¶ 18; <u>see also id.</u> ("Such efforts at family reunification shall continue so long as the minor is in [ORR] custody.").

### 2. The Homeland Security Act

The Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2136, abolished the INS and redistributed its responsibilities to other departments. It assigned "the care of unaccompanied alien children" to the ORR Director. <u>See id.</u> § 462, 116 Stat. at 2202-05 (codified as amended at 6 U.S.C. § 279). Among the duties explicitly assigned to ORR are "coordinating and implementing the care and placement of unaccompanied [minors] who are in Federal custody"; "ensuring that the interests of the child are considered in decisions and actions relating to the care and custody of" unaccompanied minors; "making placement determinations";

---

[5] In order of preference, unaccompanied minors should be released to a parent, a legal guardian, an adult relative (defined as a sibling, aunt, uncle, or grandparent), an individual or entity designated by the parent or guardian as capable and willing to care for the minor's wellbeing, a licensed program willing to accept custody, and finally any adult or entity seeking custody "when it appears that there is no other likely alternative to long[-]term detention and family reunification does not appear to be a realistic possibility." <u>Flores</u> Agreement ¶ 14.

and "conducting investigations and inspections of facilities and other entities in which unaccompanied [minors] reside." 6 U.S.C. § 279(b)(1).

HSA guidance on placement determinations prohibits ORR from releasing unaccompanied minors on their own recognizance. 6 U.S.C. § 279(b)(2)(B). In deciding where to place minors, ORR must ensure that they "are likely to appear for all hearings or proceedings in which they are involved"; "are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity"; and "are placed in a setting in which they are not likely to pose a danger to themselves or others." Id. § 279(b)(2)(A). The ORR Director must "consult with appropriate juvenile justice professionals, the Director of the Bureau of Citizenship and Immigration Services, and the Assistant Secretary of the Bureau of Border Security." Id.

### 3. The Trafficking Victims Protection Reauthorization Act

In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044, Congress set out "to enhance the efforts of the United States to prevent trafficking in persons," including in unaccompanied minors. See id. § 235, 122 Stat. at 5074-82 (codified as amended at 8 U.S.C. § 1232). Although the TVPRA reiterates that HHS is responsible for "the care and custody of all unaccompanied alien children," 8 U.S.C. § 1232(b)(1), it requires interdepartmental coordination. For example, HHS must collaborate with the Department of Homeland Security ("DHS"), along with the Department of State and the Department of Justice, "to ensure that unaccompanied alien children in the United States are safely repatriated to their country of nationality or of last habitual residence." Id. § 1232(a)(1). Likewise, the TVPRA requires those departments to "establish policies and

programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize" them. Id. § 1232(c)(1).

The TVPRA establishes guidelines for "[p]roviding safe and secure placements" for unaccompanied minors. 8 U.S.C. § 1232(c). Any child in ORR custody "shall be promptly placed in the least restrictive setting that is in the best interest of the child." Id. § 1232(c)(2)(A). In making that placement determination, ORR "may consider danger to self, danger to the community, and risk of flight." Id. Moreover, the TVPRA provides that an unaccompanied minor "may not be placed with a person or entity unless the Secretary of [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." Id. § 1232(c)(3)(A). That determination "shall, at a minimum, include verification of the custodian's identity and relationship to the child, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." Id. Finally, the TVPRA provides that on ORR's request, DHS "shall provide information necessary to conduct suitability assessments from appropriate Federal, State, and local law enforcement and immigration databases." Id. § 1232(c)(3)(C).

### 4. The ORR Policy Guide

ORR has developed an internal policy document governing the placement, care, and release of unaccompanied minors in its custody. Compl. ¶ 43; id. Ex. 3 [Dkt. No. 21-3] ("Policy Guide"). The Policy Guide was first posted on ORR's website in 2015 and has been frequently amended since then. See Compl. Ex. 4 [Dkt. No. 21-4]. No part of the guide was developed through notice-and-comment procedures under the Administrative Procedure Act ("APA"). Compl. ¶ 43.

Section 2 of the guide lays out ORR's policies with respect to securing "the timely release of children" in ORR custody "to qualified parents, guardians, relatives or other adults, referred to as 'sponsors.'" Policy Guide § 2.1. Under the Policy Guide, "safe and timely release must occur within a setting that promotes public safety and ensures that sponsors are able to provide for the physical and mental well-being of children," and ORR must abide by its duty to "protect children from smugglers, traffickers, or others who might seek to victimize" them. Id.

The Policy Guide details a multistep process for securing an unaccompanied minor's release. First, the "case manager," typically an employee of the facility in which the minor is being held, interviews the child to explore possible sponsors and ranks the possibilities into four categories in order of preference: (i) a parent or legal guardian; (ii) an immediate relative (a sibling, aunt, uncle, grandparent, or first cousin, including relatives by marriage); (iii) a distant relative or unrelated adult; and (iv) no identifiable sponsor. Policy Guide § 2.2.1. The case manager then reaches out to any potential sponsor, who must complete a "Family Reunification Application" if she wishes to take custody of the minor. Id. §§ 2.2.1-.3. Applications must include, among other things, identification and fingerprints for the sponsor and "all adults residing with the sponsor," which ORR uses to run background checks. Id. §§ 2.2.4, 2.5, 2.6.2 (providing that ORR "transmits the fingerprints to [DHS] to perform criminal and immigration status checks"). "ORR does not disqualify potential sponsors on the basis of their immigration status," but rather "uses status information to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States." Id. § 2.5.2; see id. § 2.6. If any adult in a sponsor's household refuses to comply with the background check requirement, ORR will deny the sponsor's application. Id. § 2.5.3.

The Policy Guide also outlines how ORR decides whether to release an unaccompanied minor to a sponsor. It identifies ten criteria that ORR "considers . . . when evaluating family members and other potential sponsors," including the "nature and extent of the sponsor's previous and current relationship with the child"; the "sponsor's motivation for wanting to sponsor the child"; whether the minor "wants to be released to the individual"; the "sponsor's understanding of the [minor's] needs"; "[t]he sponsor's plan to provide adequate care, supervision, access to community resources, and housing"; the sponsor's "understanding of the importance of ensuring the . . . child's presence at all future hearings or proceedings"; and the "sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns." Policy Guide § 2.4.1.

Finally, the Policy Guide establishes the decisionmaking process for family reunification applications. An application will not proceed unless and until a case manager recommends to the ORR Director that the minor be released to a sponsor. See Policy Guide § 2.7. The Director may grant or deny the application or remand to the case manager for additional factfinding. Id. §§ 2.7.3-.5. If the would-be sponsor is a parent or legal guardian and the Director denies the application, the Director sends a written denial letter within 30 business days explaining the reasons for the denial. Id. § 2.7.7. The parent or guardian may appeal the Director's decision to the Assistant Secretary for Children and Families within 30 days; that appeal takes the form of a tele- or videoconference with the Assistant Secretary at which the sponsor "may explain the reasons why he or she believes the denial was erroneous." Id. § 2.7.8. If on the other hand the would-be sponsor is anyone other than a parent or guardian, the case manager verbally notifies the sponsor of the denial, and no appeal is available. Id. § 2.7.7.

5. <u>The Memorandum of Agreement</u>

In April 2018, ORR entered into a Memorandum of Agreement ("MOA") with ICE and

CBP to "implement processes . . . to share information" about unaccompanied minors,

"including in the vetting of potential sponsors and adult members of potential sponsors'

households." Compl. Ex. 1 [Dkt. No. 21-1] ("MOA") art. II. The MOA's purpose is to provide

ORR "with information necessary to conduct suitability assessments for sponsors" and to ensure

"that the transfer, placement, and release of [unaccompanied minors] are safe for the [minors]

and the communities into which they are released." <u>Id.</u> Accordingly, the MOA provides that

"ORR will request from ICE information about all potential sponsors and adult members of

potential sponsors' households," including "citizenship, immigration status, criminal history, and

immigration history." <u>Id.</u> art. V(A)(1)(a). To facilitate that information transfer, "ORR will

provide ICE with the name, date of birth, address, fingerprints . . . , and any available

identification documents or biographical information regarding the potential sponsor and all

adult members of the potential sponsor's household." <u>Id.</u> art. V(B).[6] ICE will then perform a

criminal and immigration history background check; ORR remains responsible for searching

"various databases including public records, Sex Offender Registry, National (FBI) Criminal

History, Child Abuse and Neglect, State Criminal History Repository, and local police records

for all potential sponsors." <u>Id.</u> art. V(B)(1). The MOA has now been incorporated into ORR's

Policy Guide. <u>See</u> Policy Guide, §§ 2.5-.6.

---

[6] Before the MOA, ORR required all members of a potential sponsor's household to submit
identification and fingerprints only in limited circumstances, for instance where there were
"indicia that the child had been trafficked." <u>See</u> Defs.' Memo. 6. That policy had been in place
since 2015. <u>Id.</u>

## C. **Plaintiffs' Complaint**

As amended, Plaintiff's complaint contains six counts. Counts I, II, and III relate to ORR's procedures governing the submission, review, and approval of family reunification applications. Count I alleges that these procedures violate the TVPRA; Count II, that they violate plaintiffs' substantive due process rights; and Count III, that they violate plaintiffs' procedural due process rights. Counts IV and V, brought under the APA, relate only to ORR's recently adopted policy to request biographical and biometric information from all adult members of potential sponsors' households and to share that information systematically with DHS. Count IV claims that the policy is void for failure to comply with the APA's notice-and-comment rulemaking procedures, while Count V claims that the policy is arbitrary and capricious or contrary to law. Finally, Count VI seeks habeas relief under 28 U.S.C. § 2241(c) on behalf of the minor plaintiffs and other unaccompanied minors similarly situated.

Defendants submit that many of the counts alleged in plaintiffs' complaint are duplicative or improper, arguing that there is no private right of action under the TVPRA and that plaintiffs' due process claims should not have been pleaded as standalone counts. These arguments are largely academic because both sides essentially agree that plaintiffs may advance their constitutional and statutory claims either as part of a § 2241 petition, see D.B, 826 F.3d at 731, or under the APA, see 5 U.S.C. § 702. Compare Pls.' Opp'n 39 n.32, with Defs.' Reply 6 n.7. Accordingly, the Court will address plaintiffs' complaint as it has been pleaded, with the understanding that Counts I, II, and III are being asserted through § 2241(c) (with respect to the minor plaintiffs) or through the APA (with respect to the sponsor plaintiffs).

## A. **Standard of Review**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, an action must be dismissed if the court lacks subject matter jurisdiction. The plaintiff, as the party asserting jurisdiction, bears the ultimate burden of proving such jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). If "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based[,] . . . all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Id. But in the event of a factual dispute over the jurisdictional allegations in the complaint, the court may consider evidence outside the complaint "without converting the proceeding to one for summary judgment." Id.

A complaint should be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 570). The Court must "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor," Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002), but only to the extent those allegations pertain to facts rather than legal conclusions. See Iqbal, 556 U.S. at 678-

79. Ultimately, "determining whether a complaint states a plausible claim is context specific,

requiring the reviewing court to draw on its experience and common sense." Id. at 679.

## B. Justiciability

Federal courts' power to adjudicate disputes extends only to "cases" and "controversies."

U.S. Const. art. III, § 2. "If a dispute is not a proper case or controversy, the courts have no

business deciding it, or expounding the law in the course of doing so." DaimlerChrysler Corp. v.

Cuno, 547 U.S. 332, 341 (2006). The closely interrelated doctrines of standing, ripeness, and

mootness "are simply subsets" of this unflagging Article III requirement. Bryant v. Cheney,

924 F.2d 525, 529 (4th Cir. 1991). Standing, an "essential and unchanging part of the case-or

controversy requirement," Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992), ensures that the

party seeking relief has a genuine and personal stake in the outcome. Gill v. Whitford, 138 S. Ct.

1916, 1923 (2018). Ripeness, in turn, "can be characterized as standing on a timeline,"

Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc): It

"concerns the appropriate timing of judicial intervention," In re Naranjo, 768 F.3d 332, 347 (4th

Cir. 2014), and serves "to prevent the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements," Abbott Labs. v. Gardner, 387 U.S. 136, 148

(1967). Finally, mootness ensures that the dispute is sufficiently concrete throughout all stages of

the proceeding; "[a] case that becomes moot at any point . . . is no longer a Case or Controversy

for purposes of Article III." United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1537 (2018)

(internal quotation marks and citation omitted).

### 1. Mootness

Defendants argue that because J.E.C.M., R.A.I., and K.T.M. have been released, their

claims, along with those of their sponsors, "are no longer 'live.'" Defs.' Memo. 13 (quoting

Powell v. McCormack, 395 U.S. 486, 496 (1969)). In support, defendants point to a line of cases holding that "[r]elease from detention—whether premised upon civil immigration proceedings or otherwise—typically renders any claim about the propriety of that continued detention moot." Id. (citing Watson v. INS, 271 F. Supp. 2d 838, 839-40 (E.D. Va. 2003) (dismissing as moot a habeas petition seeking release from INS custody after the petitioner was deported), and Atem v. Ashcroft, 312 F. Supp. 2d 792, 796 (E.D. Va. 2004) (dismissing as moot the "custodial" issues of a habeas petition after the petitioner's release from custody)). This argument flows from the principle that if a plaintiff "received what he pleaded such that 'a favorable judicial decision' cannot redress any 'actual injury,'" he no longer has standing to prosecute his case. Atem, 312 F. Supp. 2d at 796 (quoting Spencer v. Kemna, 523 U.S. 1, 7 (1998)).

Six of the eight plaintiffs—J.E.C.M., R.A.I., and K.T.M., along with their respective sponsors—have received the relief they were seeking. See Compl. at 63-64. Those plaintiffs have not stated claims for retrospective forms of relief that could preserve their claims even after release.[7] Consequently, they lack the sufficient "personal stake in the outcome of the controversy" that Article III requires. Baker v. Carr, 369 U.S. 186, 204 (1962).

Plaintiffs resist the conclusion that those claims are moot. Their first recourse is the well-trodden exception holding that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." City of

---

[7] That plaintiffs also sought declaratory relief as well as attorney's fees and costs, see Compl. at 63-64, does not affect the Court's mootness analysis. The Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights," CGM, LLC v. BellSouth Telecomms., Inc., 664 F.3d 46, 55 (4th Cir. 2011), and whether the six plaintiffs whose claims are now moot qualify as "prevailing" parties under statutory attorney's fee provisions is not before the Court.

Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). When this exception applies, a case becomes moot only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," and the party asserting mootness bears a "heavy burden" of persuading the court as much. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (citations omitted).

Plaintiffs' voluntary cessation argument is unconvincing. Release from custody is not the type of official conduct that normally triggers the concerns animating the voluntary cessation doctrine, and courts are reticent to assume that officials will re-seize released individuals the moment their claims are declared moot. Here, plaintiffs' argument fails because it relies on the underdeveloped proposition that J.E.C.M., R.A.I., or K.T.M. could be taken back into ORR custody and could be once again subjected to the same ORR procedures to which they previously objected. See, e.g., Pls.' Opp'n 9. Even assuming DHS could re-arrest the three minors and transfer them back to ORR custody, the Court would still have to assume that ORR would then perform a de novo consideration of whether the minor should be released. That would be nonsensical; that J.E.C.M., R.A.I., and K.T.M. have been released indicates that the ORR Director has already concluded they can be safely handed over to their sponsors. If anything, a plaintiff who was released by ORR and subsequently re-arrested would have an entirely new claim based on ORR's prior determination, not a reawakened claim challenging the procedures leading to the initial determination.[8] Finally, the remote possibility that some fact about the

---

[8] For example, plaintiffs cite Saravia v. Sessions, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), aff'd, 905 F.3d 1137 (9th Cir. 2018), for the proposition that one of the released minors could wind up back in ORR custody. Pls.' Opp'n 9. Saravia involved a challenge brought by unaccompanied minors who had been released under sponsorship agreements and who were subsequently re-arrested on suspicion of gang activity. 280 F. Supp. 3d at 1176-77. The district court's analysis was based on the notion that "[w]hen the federal government has previously deemed an

18

sponsor or the sponsor's household could change after the minor's release and that this change

would (by some unknown mechanism) result in renewed ORR custody—rather than, say,

proceedings brought by a child protective services agency, see Defs.' Memo. 14—is far too

uncertain to justify applying the voluntary cessation exception.

Plaintiffs next argue that no claims are moot because J.E.C.M., R.A.I., and K.T.M.

remain "in custody" even after having been released to their sponsors. Pls.' Opp'n 9-10.

According to plaintiffs, "at least one federal court has found that [a minor] residing with a

sponsor pursuant to an ORR sponsor care agreement remains under ORR custody." Id. (citing

Lopez v. Sessions, No. 1:18-cv-04189, 2018 WL 2932726, at *7 (S.D.N.Y. June 12, 2018)). But

the case plaintiffs cite does not bear the weight they place on it; it involved only the question

whether a minor released under a sponsorship agreement remains in "custody" under 8 U.S.C.

§ 1232(c)(2)(B), a TVPRA provision governing what happens when a minor in ORR custody

reaches the age of majority. Lopez, 2018 WL 2932726, at *8-9. Lopez has nothing to do with the

question here, which is whether plaintiffs remain in "custody" for purposes of 28 U.S.C.

§ 2241(c). A petitioner need not be in actual physical custody to sustain a habeas action if

ongoing or collateral consequences of detention constitute "sufficient restraints on [the]

petitioner's liberty," Jones v. Cunningham, 371 U.S. 236, 241-42 (1963); however, plaintiffs

have not demonstrated why the minors' being released to their sponsors, which is the relief they

---

unaccompanied minor suitable for placement in the community with a sponsor, and when federal agents later arrest and detain the minor based on allegations of gang affiliation, the government cannot simply ship the minor across the country and place him in a secure detention facility for an indefinite period." Id. at 1194. Accordingly, Saravia does not support plaintiffs' argument on mootness; rather, it illustrates that were the released minor plaintiffs to end up back in ORR custody, they would have claims of a different sort.

sought in the first place, amounts to such a restraint on their liberty that they remain in "custody" under § 2241.

Finally, plaintiffs rely on the "particular traits of civil class actions" as they relate to justiciability principles, see Sanchez-Gomez, 138 S. Ct. at 1538, arguing that their putative class claims change the mootness calculus. To be sure, a defendant cannot nullify a putative class action by strategically "picking off" named plaintiffs' claims while a class certification motion is pending. See Pls.' Opp'n 8 (citing Wilson v. Gordon, 822 F.3d 934, 947-51 (6th Cir. 2016)). Similarly, certain claims by their nature are so "inherently transitory" that class claims remain justiciable even if the underlying individual claims become moot before the court can rule on class certification. Id. at 10 (citing U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 399 (1980)). Courts in this district have recognized as much, see Reyna v. Hott, No. 1:17-cv-01192, 2018 WL 3551558, at *3 (E.D. Va. Mar. 20, 2018), and defendants offer no objection, see Defs.' Reply 2 n.1 (recognizing "that the pending class action claims do not automatically become moot because these individuals' claims have become moot"). But neither doctrine saves individual claims from being mooted. Here, the three minor plaintiffs who have been released and the three sponsors to whom they have been released received the relief they sought in this litigation; they no longer possess the requisite stake to press their individual claims. Accordingly, the Court will grant defendants' motion to dismiss as to individual claims advanced by J.E.C.M., Jimenez Saravia, R.A.I., Alvarado, K.T.M., and Velasquez Trail.

   2. Ripeness

On the reverse side of the justiciability coin, defendants argue that B.G.S.S.'s and Jeronimo Sis's claims are not ripe. In defendants' view, the only Article III injury that could sustain their challenge to ORR's policies would be an outright denial of Jeronimo Sis's family

reunification application. See Defs. Memo. 14-15. Because it is "possible that ORR will ultimately approve" that application, defendants argue that plaintiffs could suffer no injury at all and consequently that the Court presently lacks jurisdiction over their claims. See id. at 15.

"Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hosp. Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003). Whether an issue is fit for judicial determination turns on various factors, among which are "whether it is purely legal" and "whether consideration of the issue would benefit from a more concrete setting." Energy Future Coal. v. EPA, 793 F.3d 141, 146 (D.C. Cir. 2015). This analysis "is not an exact science," and "courts must ultimately rely on the exercise of practical common sense." Am. Fed'n of Gov't Emp's, AFL-CIO v. Trump, 318 F. Supp. 3d 370, 409-10 (D.D.C. 2018) (internal quotation marks and citations omitted), appeal docketed, No. 18-5289 (D.C. Cir. Sept. 26, 2018).

The remaining plaintiffs' claims are ripe. Were B.G.S.S. to be released to Jeronimo Sis's custody, their individual claims would be mooted; however, until that happens, B.G.S.S. continues to suffer an ongoing deprivation of his personal liberty interest, and he and Jeronimo Sis continue to suffer an ongoing deprivation of their interest in family unity. Because the remaining plaintiffs claim that they are injured not only by the possible denial of their family reunification application but also by the process through which ORR will reach a decision (or fail to act) on that application, their claims are ripe, and there is no prudential reason why the Court should decline to adjudicate them.

### 3. Standing

The last of defendants' justiciability-based arguments is that the remaining plaintiffs lack standing to challenge ORR's policy of demanding biographical and biometric information from all adult members of a sponsor's household and of systematically sharing that information with DHS (the "information-sharing policy"). Defs.' Reply 4-5. In defendants' view, no plaintiff can claim to be suffering current or imminently impending injury as a result of the information-sharing policy, and any past harms stemming from that policy are insufficient to support plaintiffs' claims for prospective relief. Id. at 4.

Defendants are incorrect. Although Jeronimo Sis had completed her family reunification application on B.G.S.S.'s behalf, she had to separate herself from her partner and daughter to satisfy ORR. ORR's policy presented Jeronimo Sis with a difficult dilemma: She could continue living with her family, thereby abandoning all hope of getting custody of her younger brother, or she could separate from her family and proceed with the application. Taking seriously plaintiffs' allegations of the harms B.G.S.S. is suffering due to his ongoing detention, the Court concludes that Jeronimo Sis faced a Hobson's choice and that the practical effect of ORR's information-sharing policy was to force her to separate from her partner and daughter. This constitutes an ongoing invasion of the "freedom of personal choice in matters of marriage and family life . . . protected by the Due Process Clause," Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639 (1974), and supports Jeronimo Sis's standing to prosecute the APA claim. Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006), defendants' motion to dismiss the APA claim for lack of standing will be denied.

## C. **ORR's Information-Sharing Policy**

In Counts IV and V, plaintiffs allege that the ORR policy of "denying release where an immigrant child's sponsor cohabits with other adults who are unwilling to provide their fingerprints and biographic information to be shared with ICE to be used [for] immigration enforcement" violates the APA. Compl. at 63; see Pls.' Opp'n 11-12. Plaintiffs advance both procedural and substantive challenges to that information-sharing policy.

### 1. Notice and Comment

Count IV alleges that ORR's information-sharing policy is a legislative rule and thus should have been developed through notice-and-comment rulemaking procedures under the APA. Pls.' Opp'n 30. Defendants disagree, arguing that ORR's policy is exempted from those procedures as an "interpretative" rule. Defs.' Memo. 20-24.[9] Plaintiffs have stated a plausible claim that the information-sharing policy should have gone through notice and comment.

The APA's notice-and-comment procedures ensure that an agency "benefit[s] from the expertise and input of the parties who file comments" and "maintains a flexible and open-minded attitude towards its own rules." Chocolate Mfrs. Ass'n of the U.S. v. Block, 755 F.2d 1098, 1103

---

[9] Defendants also argue that the policy is exempted from notice and comment as a "rule[] of agency organization, procedure, or practice." Defs.' Memo. (citing 5 U.S.C. § 553(b)(A)). The policy plaintiffs challenge is not procedural; it substantively governs under what conditions a sponsor may be precluded from taking custody of a minor. Even if the policy could be fairly labeled as procedural, "[w]here nominally 'procedural' rules 'encode[] a substantive value judgment' or 'substantially alter the rights or interests of regulated' parties, . . . the rules must be preceded by notice and comment." Air Transp. Ass'n of Am. v. Dep't of Transp., 900 F.2d 369, 376 (D.C. Cir. 1990) (second alteration in original) (citation omitted), vacated as moot per curiam, 933 F.2d 1043 (D.C. Cir. 1991); accord Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 349 (4th Cir. 2001) (only rules that do not "alter the rights or interests of parties" fall within the procedural exception to notice and comment (citation omitted)). Such is the case here: The Policy Guide makes clear that no person living with adults who are unwilling to provide identification and fingerprints can ever apply to sponsor an unaccompanied minor, Policy Guide § 2.5.3, which clearly affects potential sponsors' substantive rights.

(4th Cir. 1985) (citation omitted). But "interpretative rules" are exempt from those procedural requirements. 5 U.S.C. § 553(b)(A). The line between interpretive[10] rules and "legislative" or "substantive" rules, which require notice and comment, is notoriously fuzzy. See Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1204 (2015) (the term "interpretive rule" is "not further defined by the APA, and its precise meaning is the source of much scholarly and judicial debate"); Gen. Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) ("[T]he distinction between legislative and nonlegislative rules has been described as enshrouded in considerable smog." (internal quotation marks and citation omitted)). Generally, "interpretive rules simply state what the administrative agency thinks a statute means, and only remind affected parties of existing duties." Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1340-41 (4th Cir. 1995); see also Perez, 135 S. Ct. at 1204 ("[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" (citation omitted)). Conversely, a legislative rule "creates new law or imposes new rights or duties" or "expand[s] the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created." Children's Hosp. of the King's Daughters, Inc. v. Azar, 896 F.3d 615, 620 (4th Cir. 2018) (alteration in original) (citations omitted).

In navigating the line between interpretive and legislative rules, the Fourth Circuit considers an agency's "own conduct" to be "highly relevant." Nat'l Council for Adoption v. Jewell, 156 F. Supp. 3d 727, 737 (E.D. Va. 2015) (alteration in original) (quoting N.C. Growers'

---

[10] As the Supreme Court has explained, "interpretive" is now the more common, and the preferred, term. Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1204 n.1 (2015).

Ass'n, Inc. v. United Farm Workers, 702 F.3d 755, 765 (4th Cir. 2012)). Similarly relevant is "how the agency itself characterizes the document at issue." Id. Courts also consider "the actual or intended effect of the rule"—that is, whether the rule is binding and whether it leaves officials with discretion—and whether it effects a change in a longstanding position of the agency and thereby "create[s] new legal obligations." Id. at 737-38.

The information-sharing policy is legislative in nature. ORR's choice not to use notice and comment to some extent supports defendants' assertion that the policy is an interpretive rule, but that fact alone is not sufficient; otherwise, agencies could skirt § 553 at will simply by labeling rules "interpretive" regardless of their content or effect on regulated entities. What is more, all other signs point toward the information-sharing policy's being a legislative rule. The policy did much more than "remind affected parties of existing duties," Chen Zhou Chai, 48 F.3d at 1340-41. It added an entirely new obligation with respect to potential sponsors, like the sponsor plaintiffs in this action, for whom there are no specific "indicia of risk to the safety of the child," see Defs.' Memo. 23. For would-be sponsors in Jeronimo Sis's position, the effect of the information-sharing policy is to bar them from all possibility of obtaining custody over a minor unless they live in a home where all adult occupants voluntary disclose their biographical and biometric information or choose to leave a home where the occupants are unwilling to do so. Nor is the rule being challenged merely a gap-filling interpretation that does not bind regulated parties or the agency. Defendants do not suggest that the policy is nonbinding, and for good reason: The Policy Guide states, without exception, that "ORR denies release when an adult household member refuses to have a background check." Policy Guide § 2.5.3.[11]

---

[11] Defendants assert that "nothing in the [Policy] Guide or in ORR's practices precludes the agency from waiving collection of the fingerprints of household members in special

25

Children's Hospital of the King's Daughters supports this conclusion. In that case, the plaintiff hospital challenged an HHS policy providing that payments from private insurers should be included in calculating the amount of available financial assistance, claiming that the policy should have been subject to notice and comment. 896 F.3d at 615-19. The Fourth Circuit agreed, reasoning that the policy fell "on the legislative end of the spectrum" due to a combination of two factors. Id. at 620-21 (internal quotation marks and citation omitted). First, because nothing in the governing statutes explicitly addressed the issue of private insurance, the rule could not be said to have been derived from a statute "whose meaning compels or logically justifies the proposition." Id. at 621-22 (citation omitted). Second, in promulgating the rule, HHS had relied on its statutorily delegated authority to determine which payments should be included, and the Fourth Circuit observed that "[w]hen an agency relies on expressly delegated authority to establish policy[,] . . . courts generally treat the agency action as legislative." Id. at 622.

Both factors on which the Fourth Circuit relied are present here. Although the TVPRA generally requires ORR to determine "that the proposed custodian is capable of providing for the child's physical and mental well-being" before a minor may be released, 8 U.S.C. § 1232(c)(3)(A), nowhere does the TVPRA (or any other statute) specify what information ORR can solicit, or from whom, or based on what circumstances. ORR's promulgation of the information-sharing policy was thus more an act of legislation than of interpretation. Further, in entering into the MOA and promulgating the policy, ORR was acting in accordance with a broad

---

circumstances." Defs.' Memo. 21 n.12. That an agency might, at times and for reasons unknown, exercise discretion to waive a requirement does not make that requirement nonlegislative any more than a prosecutor's decision not to bring a case makes the underlying criminal offense nonenforceable.

26

congressional grant of policymaking authority. See, e.g., id. § 1232(c)(1) (providing that HHS and DHS, along with the Attorney General and Secretary of State, "shall establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers"). This, too, supports a finding that ORR has created a "new legal norm based on [its] own authority to engage in supplementary lawmaking." Children's Hosp. of the King's Daughters, 896 F.3d at 622 (internal quotation marks and citation omitted).

Defendants' arguments to the contrary are unconvincing. They first argue that the Policy Guide is amended frequently and thus is a "living document" that may change "as new policies are updated or incorporated into the program." Defs.' Memo. 21. This argument misses the mark; whether the agency may subsequently amend a rule does not affect whether that rule has present binding force on parties' actions or major consequences for parties' substantive rights. Defendants also argue that the policy "makes no revision to the substantive statutory standards governing ORR's suitability assessments," id. at 9 (citing 6 U.S.C. § 279(b)(1)-(2) and 8 U.S.C. § 1232(c)(3)(A)), "or to the criteria that ORR uses to evaluate sponsor applications," id. (citing Policy Guide § 2.4.1). This argument elevates form over substance. As discussed above, the policy effectively imposes a new threshold requirement on all potential sponsors, a requirement that is nowhere to be found in the governing statutes. Finally, defendants argue that the information-sharing policy effected only an "incremental" change in the release process. Id. at 10-11; see also Defs.' Memo 23. The Court disagrees. Although ORR previously required biographical and biometric information from adult members of a sponsor's household "when there were certain indicia of risk to the safety of the child," Defs.' Memo. 23, the switch from that tailored policy to the present across-the-board requirement is a significant one. Plaintiffs

have adequately stated a claim that ORR's shift was sufficiently substantial and substantive to require notice and comment.

2. Arbitrary and Capricious or Contrary to Law

In Count V, plaintiffs claim that ORR's information-sharing policy violates the APA's substantive requirements. Under the APA's judicial review provisions, courts must set aside final agency action[12] that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Although arbitrary-and-capricious review is necessarily deferential and narrow in scope, the standard "does not reduce judicial review to a rubber stamp." Ergon-W. Va., Inc. v. U.S. EPA, 896 F.3d 600, 609 (4th Cir. 2018) (citation omitted). Similarly, where an agency's decision does not comport with governing statutes or regulations, that decision is "not in accordance with law" and must be set aside. See, e.g., Ellis v. Ritchie, 803 F. Supp. 1097, 1101 (E.D. Va. 1992).

In its own words, "ORR is not a law enforcement agency"; rather, its "priority is to care for the child while working to safely and promptly release the child to a responsible adult, typically a family member." Compl. Ex. 2 [Dkt. No. 21-2] 1. That priority is precisely what Congress mandated for ORR. See, e.g., 6 U.S.C. § 279(b)(1) (delegating to ORR the

---

[12] Judicial review is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants do not dispute that the MOA and the resulting information-sharing policy, as reflected in ORR's amendment of the Policy Guide, amount to final agency actions.

responsibility for caring for and placing unaccompanied minors and "ensuring that the interests of the child are considered" in all actions relating to care and placement); 8 U.S.C. § 1232(c)(3)(A) (requiring ORR to make release determinations in light of "the child's physical and mental well-being"). Yet plaintiffs have plausibly alleged that in recent years, ORR has increasingly focused on law and immigration enforcement to the detriment of child welfare. Equally plausible is plaintiffs' argument that in funneling biographical and biometric information for all adults living in a potential sponsor's household to DHS—regardless of the would-be sponsor's immigration status or of any indicia of risk factors—the information-sharing policy is primarily designed to serve immigration enforcement efforts. Plaintiffs are thus entitled to proceed to discovery on their claim that ORR's decision was arbitrary and capricious because it was motivated by "factors which Congress has not intended it to consider," State Farm, 463 U.S. at 43.

Likewise, plaintiffs have alleged sufficient facts indicating that ORR "entirely failed to consider an important aspect of the problem," State Farm, 463 U.S. at 43. Indiscriminately sharing sensitive information about all adults in a sponsor's household with DHS could result in DHS's taking immigration enforcement action against those individuals, which could destabilize the home environments into which unaccompanied minors may be released. This runs counter to ORR's mission to release the children in its custody into stable, nurturing environments. Moreover, the amicus brief filed on behalf of the Human Trafficking Legal Center confirms what common sense dictates, namely that the information-sharing policy could dissuade otherwise qualified sponsors from filing family reunification applications, forcing ORR to hold unaccompanied minors in custody for longer than necessary or to release them to less qualified or unrelated sponsors. Br. of Amicus Curiae Human Trafficking Legal Center in Opp'n to Defs.'

Mot. to Dismiss [Dkt. No. 45] 2, 8-13. Taken together and assumed to be true, plaintiffs' allegations plausibly indicate that far from protecting minors, the information-sharing policy "put[s] children at greater risk." Id. at 15.

For similar reasons, plaintiffs have also stated a claim that the information-sharing policy is contrary to law. A policy that systematically elevates immigration enforcement over child welfare, one whose effects are to destabilize would-be sponsors' home environments and to discourage potential sponsors from applying for reunification, is flatly inconsistent with ORR's statutory responsibility to care for unaccompanied minors in its custody and release them promptly to safe and stable environments. Plaintiffs also state a plausible claim that the policy violates ORR's ongoing legal obligation under the Flores Agreement to release minors "without unnecessary delay," Flores Agreement ¶ 14.

Defendants argue that the governing statutes envision "the sharing of immigration-related information among federal agencies," and thus the information-sharing policy cannot be contrary to law. Defs.' Reply 11 (citing 6 U.S.C. § 279(b)(2) and 8 U.S.C. § 1232(c)(3)(C)).[13] This argument fails because plaintiffs are not challenging the fact that ORR and DHS could exchange information with respect to some individuals where necessary; instead, they are challenging ORR's policy of demanding this information from every adult in a sponsor's household and sharing the information with DHS in every case.

---

[13] Defendants also rely on 8 U.S.C. § 1373, which provides that no federal, state, or local entity or official may "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 1373 addresses only voluntary information-sharing between different levels of government and thus has no bearing on the present dispute.

Defendants also contend "that while immigration status is not disqualifying for a sponsor application, it is relevant to the suitability assessment that ORR must make." Defs.' Reply 12 (emphasis omitted). This argument has some merit. If a sponsor's immigration status makes it likely that she may not remain in the country, then a "backup" sponsor care plan may be necessary. See id. at 12-13. It may also prove true, as defendants argue, that immigration checks on other adult members of a sponsor's household could reveal underlying criminal activity, see id. at 13, and plaintiffs do not dispute that criminal background checks are relevant, see Pls.' Opp'n 14 n.20. At this time, the issue before the Court is whether to grant defendants' motion to dismiss this claim, and all plaintiffs must do to survive the motion is allege facts indicating a plausible entitlement to prevail under the law. Plaintiffs have done so; accordingly, Count V will go forward.

### D. ORR's Procedures on Family Reunification Applications

In Counts I, II, and III, Plaintiffs argue that ORR's procedures governing the submission, review, and approval of family reunification applications are "riddled with due process violations," particularly with respect to the discretion given to frontline case managers; the lack of notice or clear guidelines; and the absence of a written statement of reasons for, or right to appeal, a denial in many instances. Compl. ¶¶ 14-15; see id. ¶¶ 58-60 (identifying four specific policies that "form an opaque, impenetrable process in which sponsors and children have little sense of what will be required of them to achieve reunification, let alone any way to challenge those requirements or early peremptory decisions about sponsor viability"). They allege that as a result of these policies, "the process of reunifying the immigrant children [with their sponsors] has ground to a virtual halt." Id. ¶ 3. Plaintiffs argue that taken together, these procedures violate

both the procedural and substantive components of the Fifth Amendment's Due Process Clause as well as the TVPRA.

### 1. Procedural Due Process

In Count III, plaintiffs argue that ORR's policies governing the release of unaccompanied minors to potential sponsors violate the procedural component of the Fifth Amendment's Due Process Clause, which mandates that government may deprive an individual of a protected interest in liberty or property only through procedures providing "notice and opportunity for hearing appropriate to the nature of the case." Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950). As with most procedural due process claims, Count III is governed by the balancing framework laid out in Mathews v. Eldridge, 424 U.S. 319 (1976). See D.B. ex rel. R.M.B. v. Cardall, 826 F.3d 721, 742 (4th Cir. 2016). Under this framework, courts must consider "(1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirement[s]." Turner v. Rogers, 564 U.S. 431, 444-45 (2011) (alteration in original) (internal quotation marks and citation omitted).

Plaintiffs have stated a procedural due process claim. There is no doubt that the private interests involved are significant. B.G.S.S., who remains in ORR custody, faces an ongoing deprivation of his "interest in being free from physical detention," which has been described as "the most elemental of liberty interests." See Hamdi v. Rumsfeld, 542 U.S. 507, 529 (plurality opinion). Further, B.G.S.S. and his would-be sponsor Jeronimo Sis face a deprivation of their constitutionally protected interest in family unity. See Smith v. Org. of Foster Families for Equality & Reform, 431 U.S. 816, 845 (1977) ("[T]he liberty interest in family privacy has its

source . . . in intrinsic human rights, as they have been understood in this Nation's history and tradition." (internal quotation marks and citation omitted)). Defendants do not squarely dispute the first interest and, with respect to the second, argue only that interests between siblings "do not rise to the same level as" those involving parents and children. Id. Defendants have no response, however, to the weight of authority plaintiffs cite recognizing that the family unity interest is not unique to parents and children. To the contrary, "[o]urs is by no means a tradition limited to respect for the bonds uniting the members of a nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household with parents and children has roots equally venerable and equally deserving of constitutional recognition." Moore v. City of East Cleveland, 431 U.S. 494, 504 (1977) (plurality opinion). The family relationships captured in ORR's second-level category of would-be sponsors—siblings, aunts or uncles, grandparents, or first cousins, see Policy Guide § 2.2.1—are thus constitutionally significant.

Plaintiffs have also plausibly pleaded a substantial risk of erroneous deprivation in the absence of other procedural safeguards. For example, plaintiffs allege that case managers are given complete gatekeeping power with virtually boundless discretion and are under no obligation to issue formal denials or explain their reasons for not recommending that a minor be released. That procedure runs afoul of the principle "that where governmental action seriously injures an individual, and [where] the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." Beltran ex rel. R.M.B. v. Cardall, 222 F. Supp. 3d 476, 485 (E.D. Va. 2016) (quoting Greene v. McElroy, 360 U.S. 474, 496 (1959)). Here, as in Beltran, plaintiffs have alleged facts indicating that ORR's "opaque procedure deprive[s them] of any opportunity to contest ORR's findings, and thus any meaningful opportunity to alter its

33

conclusions." Id. Likewise, plaintiffs are entitled to proceed on the theory that ORR's procedures place impermissible burdens on would-be sponsors, with ORR maintaining custody of unaccompanied minors until such time as the sponsors move the needle toward reunification. See id. at 485-86. Defendants respond that potential sponsors are given adequate notice of the standards and procedures to govern their applications and that the necessarily fact-intensive nature of release determinations make more detailed polices impracticable or unwise. Defs.' Reply 19. If defendants are correct, then plaintiffs' challenge may ultimately fail, but that is not the question with which the Court is faced at this stage.

Finally, although no party disputes the government's interest in protecting child welfare, it bears noting that the private and governmental interests here converge to an extent. Santosky v. Kramer, 455 U.S. 745 (1982), is illustrative. In deciding the question of what standard of proof is required for termination of parental rights, the Supreme Court observed that the state's "parens patriae interest favors preservation, not severance, of natural familial bonds." Id. at 747, 766-67. The Court concluded that although the state's overriding interest is to place a child in a home suited to the child's welfare and needs, that goal was best served by "procedures that promote an accurate determination of whether the natural parents can and will provide a normal home," including "a stricter standard of proof [to] reduce factual error." Id. at 767. To be sure, Santosky is distinguishable; however, it helps demonstrate why plaintiffs' and defendants' interests are not diametrically opposed, and therefore why plaintiffs have satisfied the Rule 8 burden as to their procedural due process claim.

2. Substantive Due Process

In Count II, Plaintiffs assert a violation of the substantive component of the Due Process Clause. "Substantive due process is far narrower in scope than procedural due process and

34

requires [plaintiffs] to show not only that they have been deprived of a property interest, but also that the action causing the deprivation falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." Plyler v. Moore, 100 F.3d 365, 374 (4th Cir. 1996) (emphasis, internal quotation marks, and citations omitted). There are two independent strands of substantive due process doctrine: The first "prevents the government from engaging in conduct that 'shocks the conscience,'" United States v. Salerno, 481 U.S. 739, 746 (1987) (quoting Rochin v. California, 342 U.S. 165, 172 (1952)), and the second prohibits the government from interfering with "fundamental" rights, no matter the process used, unless the government shows that such interference is narrowly tailored to serve a compelling state interest, Reno v. Flores, 507 U.S. 292, 302 (1993). Plaintiffs rely on both.

Plaintiffs have failed to state a claim that defendants' conduct or policies shock the conscience. To proceed on this first strand, plaintiffs must allege conduct that is "patently egregious" or "outrageous," that "violates the decencies of civilized conduct," or that fails to "comport with traditional ideas of fair play and decency." County of Sacramento v. Lewis, 523 U.S. 833, 846-49 (1998) (internal quotation marks and citations omitted). Plaintiffs argue that defendants' conduct is "making it more and more difficult for children to be freed from government confinement and reunite with their families" and that this "alone could shock the modern-day conscience." Pls.' Opp'n 18. To be sufficiently egregious, the official conduct must do more than produce a harmful or unfortunate result, see Lewis, 523 U.S. at 848-49; rather, the conduct must be so out of step with contemporary norms and comparable governmental practices that no decent society could tolerate it. Although defendants' policies may prove to be unconstitutional, ultra vires, or misguided, plaintiffs have not pleaded facts indicating that

defendants' maintaining custody over children who arrive in this country with no identifiable parent or guardian violates basic principles of human decency.[14]

Plaintiffs' fundamental-rights argument fares no better. The Due Process Clause generally prohibits governmental interference with rights that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental" or "implicit in the concept of ordered liberty." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (citations omitted). In analyzing a substantive due process claim sounding in fundamental rights, the Court must first "begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" Reno v. Flores, 507 U.S. 292, 301-02 (1993) (alteration in original) (citation omitted). For example, in Flores, a group of unaccompanied minors argued that they had a fundamental right to be released from INS custody into the care of "responsible adults." Id. at 294-99. The Supreme Court described the asserted right not in general or abstract terms, but rather as that "of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." Id. at 302.

Even assuming siblings can assert, on equal footing, the fundamental right in raising a child normally asserted by parents, plaintiffs' claim still fails. "[A]lthough the family unit is a

---

[14] Plaintiffs also highlight inflammatory comments made by Trump Administration officials as evidence that defendants' policies are "motivated by anti-immigrant animus and a desire to detain as many immigrants, whether child or adult, as possible." Pls.' Opp'n 18. Plaintiffs have offered little more than "bare assertions" of guilt by association connecting the specific procedures they challenge with anti-immigrant animus, and accordingly those allegations are "not entitled to be assumed true." Iqbal, 556 U.S. at 680-81.

'fundamental precept firmly ensconced in the Constitution and shielded by Due Process,' it is 'neither absolute nor unqualified,'" and the government has countervailing interests "in protecting children from neglect and abuse and in investigating situations that may give rise to such neglect and abuse." Martin v. Saint Mary's Dep't of Soc. Servs., 346 F.3d 502, 506 (4th Cir. 2003) (citation omitted). Put simply, it is not enough for plaintiffs to point to an interest in family unity; they must instead identify a fundamental right in family unity where a minor arrives in the country with no identifiable parent or legal guardian and where it is uncertain whether a potential sponsor is connected to, or could care for, the minor. The Fourth Circuit has squarely held in a similar context that where, as here, the government must determine whether a potential guardian is fit to care for the child, "the constitutionality of state actions that interfere with family integrity depends on the adequacy of the procedures available" to contest those actions. D.B., 826 F.3d at 741. Accordingly, although plaintiffs are entitled to move forward on their procedural due process claim, their substantive due process claim will be dismissed for failure to identify a carefully delineated fundamental right infringed by ORR.

3. Violations of the TVPRA

Finally, plaintiffs have plausibly alleged that ORR's procedures for receiving, processing, and reaching a decision on family reunification applications violates the TVPRA. The TVPRA codifies the longstanding requirement, stretching back to the Flores Agreement, that unaccompanied minors be "promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A). The focus of the TVPRA is on minors' "physical and mental well-being" and the potential "custodian's identity and relationship to the child," id. § 1232(c)(3)(A). Plaintiffs' allegations that ORR is not acting in a way that respects the best interests of minors in ORR custody; that ORR is prioritizing immigration enforcement over

minors' physical and mental well-being; and that ORR is not acting, as plaintiffs put it, "with an urgency commensurate with the importance of placing children with families instead of in government institutions," Pls.' Opp'n 26, satisfy the requirements of Rule 8.

To be sure, the TVPRA is not a detailed statute, and defendants correctly identify elements of the statute that could potentially support its policies. All that the Court must decide for purposes of this motion to dismiss is whether plaintiffs have plausibly stated an entitlement to relief. They have.

### III. CONCLUSION

For the reasons stated above, defendant's motion to dismiss [Dkt. No. 35] will be GRANTED in part as to the individual claims of plaintiffs J.E.C.M., Jimenez Saravia, R.A.I., Alvarado, K.T.M., and Velasquez Trail and as to Count II and DENIED in all other respects by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _15th_ day of November, 2018.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge