1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
J.E.C.M., et al.,              .      Civil Action No. 1:18cv903
                               .
      Plaintiffs/Petitioners,  .
                               .
      vs.                      .      Alexandria, Virginia
                               .      November 22, 2019
JONATHAN HAYES, Director,      .      10:07 a.m.
Office of Refugee              .
Resettlement, et al.,          .
                               .
      Defendants/Respondents.  .
                               .
.  .   .   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS/             REBECCA R. WOLOZIN, ESQ.
    PETITIONERS:                SIMON SANDOVAL-MOSHENBERG, ESQ.
                                Legal Aid Justice Center
                                6066 Leesburg Pike, Suite 520
                                Falls Church, VA 22041
                                  and
                                DALLIN G. GLENN, ESQ.
                                Sterne, Kessler, Goldstein &
                                Fox PLLC
                                1100 New York Avenue, N.W.
                                Washington, D.C. 20005


FOR THE DEFENDANTS/             DENNIS C. BARGHAAN, JR., AUSA
    RESPONDENTS:                CATHERINE M. YANG, AUSA
                                JEFFREY A. HALL, SAUSA
                                United States Attorney's Office
                                2100 Jamieson Avenue
                                Alexandria, VA 22314


ALSO PRESENT:                   KATRINA HODGES, ESQ.

(Pages 1 - 25)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Third Floor
 2                                   401 Courthouse Square
                                     Alexandria, VA 22314
 3                                   (703)299-8595

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          THE CLERK:  Civil Action 18-903, J.E.C.M., et al.

3   versus Jonathan Hayes, Director, Office of Refugee

4   Resettlement, et al.  Would counsel please note your

5   appearances for the record.

6          THE COURT:  Mr. Barghaan, you've got so much paper

7   there, I don't know what -- we're not trying the case.

8          MR. BARGHAAN:  It's pretty much all that I do now,

9   Your Honor.  It's some sort of manual labor.

10          THE COURT:  All right, counsel, do you want to

11   identify yourselves for the record, please?

12          MS. WOLOZIN:  Good morning, Your Honor.  My name is

13   Becky Wolozin; I'm with Legal Aid Justice Center; and my

14   cocounsel, Dallin Glenn, is with Sterne, Kessler, Goldstein &

15   Fox; and Simon Sandoval-Moshenberg is also with Legal Aid

16   Justice Center.

17          THE COURT:  Good morning.

18          MS. WOLOZIN:  And just for Your Honor's knowledge,

19   I'm prepared to discuss the due process claims, and my

20   cocounsel will discuss the claims related to the ICE sharing

21   policy.

22          THE COURT:  All right.

23          MS. WOLOZIN:  Thank you.

24          THE COURT:  And for the defense?

25          MS. YANG:  Good morning, Your Honor.  Catherine Yang

4

1   from the U.S. Attorney's Office, on behalf of the government.

2   With me today are my colleagues, Dennis Barghaan and Jeffrey

3   Hall.  Along with us we have agency counsel from the Department

4   of Health and Human Services, Katrina Hodges.

5           THE COURT:  All right.  Well, what we have on the

6   record this morning is the plaintiffs' motion for summary

7   judgment and the federal defendants' motion for summary

8   judgment, which both sides have briefed extensively, so I don't

9   need to hear a whole lot of argument, but I would like, I guess

10  we'll start with the plaintiffs.

11          And I'm curious, the question I first have is what,

12  what is the actual remedy you're seeking under Count 1?  What

13  do you want the Court to do in this case on Count -- as to

14  Count 1?

15          MR. GLENN:  Thank you, Your Honor.  As to the ICE

16  sharing policy?

17          THE COURT:  Yeah.

18          MR. GLENN:  The, the Count 1 -- I'm sorry, could you

19  refresh me, is that -- is Count 1 the --

20          THE COURT:  I just want to know, again, this is a

21  very difficult and complicated case because we're dealing --

22  and my greatest concern is with minors.  I know there's also an

23  issue about, you know, the family members' rights to family

24  unification and having access to these children, but the real

25  concern, and it should be for everybody in this case, is how

1    these unaccompanied minor children are being handled, and I

2    don't -- I don't think anyone disputes the fact that it's not

3    in these children's best interest for them to be held in ORR

4    custody any longer than necessary.  I mean, that's a

5    fundamental everybody agrees on.

6           And the second fundamental that everybody agrees on

7    or should agree upon is that the placement of these children is

8    a very serious responsibility that the government has, and it

9    has to make sure that wherever the children are placed is a

10   safe environment.  I don't think anyone disputes that.  And

11   that should be the core and sole interest of the federal

12   defendants in this process.

13          And so what you have done in your case -- and this

14   case, of course, has been morphing because the government's

15   been changing the policy and even some of the legislation now

16   has changed some of the original problems that existed when

17   this case was first filed.  So it's a case that has been

18   constantly morphing, but we're at this point now where both

19   sides are asking the Court, you know, to either end the

20   litigation or significantly reduce the amount of issues that

21   would have to go forward to litigation.

22          And so, you know, in looking at the situation, if the

23   plaintiff could get exactly what the plaintiffs want, what is

24   it you want out of this litigation?

25          MR. GLENN:  Yes, Your Honor.  The plaintiffs seek to

1    have the ICE sharing policy set aside for failure to follow

2    notice and comment as being contrary to law.

3            THE COURT:  And by that you mean you don't want ORR

4    having anything to do with ICE?  Is that what you're asking, no

5    communication with ICE whatsoever about this process?

6            MR. GLENN:  No, Your Honor.  We're referring to

7    specific portions of the MOAs; that's particularly section 5.

8            THE COURT:  All right.

9            MR. GLENN:  And then the ORR guide at section 2.5.

10           THE COURT:  All right.  And specifically, what do you

11   want the Court to tell the government it can no longer do?

12           MR. GLENN:  We want the Court to tell them that they

13   can no longer enforce those provisions, that they're set aside.

14           THE COURT:  All right.  And that, that is what you're

15   seeking in this case?

16           MR. GLENN:  Yes, Your Honor.

17           THE COURT:  All right.  Let me have the government

18   respond to that.  And that is, specifically if, if you are not

19   permitted to interact with ICE in that respect, to what extent

20   does that limit your ability to safely vet the custodial

21   situations for these minors?

22           MS. YANG:  Yes, Your Honor.  With respect to the

23   coordination between ORR and D HS, that coordination, as Your

24   Honor is aware, goes back many years and is expressly permitted

25   in the TVPRA, which contains an express provision that says

1    that when ORR makes a request for information that it can use

2    in the sponsor assessability assessment process, DHS must by

3    statute provide that information.

4           So our position is that it's not appropriate to, to

5    prohibit ORR and DHS from sharing information about sponsors

6    because that is the very type of coordination that's

7    contemplated by the statute.

8           THE COURT:  Now, as I understand it, the current

9    state of legislation prohibits DHS from using any of that

10   information; that is, they've been contacted by ORR to check

11   out a particular individual or group of people; and as I

12   understand, the current legislation prohibits DHS from then

13   saying, oh, we can now look at this person, and if their status

14   is illegal, we can take action against them.

15          MS. YANG:  That's correct.

16          THE COURT:  Do I understand --

17          MS. YANG:  That's correct, Your Honor.

18          THE COURT:  But I also understand that's simply a

19   statute that's going to expire, I believe, in November of this

20   year.

21          MS. YANG:  No, Your Honor.  Just yesterday, Congress

22   passed another continuing resolution.

23          THE COURT:  For 30 days.

24          MS. YANG:  For another 30 days, so that brings us to

25   the end of December.  And to the point of the continuing

1   resolution being, you know, having a temporal scope, the fact

2   that there is a temporal scope doesn't make it any less of a

3   statute.  Fourth Circuit authority is clear that even an

4   appropriations rider is still a full-blown statute, and so long

5   as it remains in effect, that a separate aspect -- the

6   legislation is a separate legislative activity in addition to

7   the agency action that has really removed the issue from being

8   a live one.

9           THE COURT:  But as you know, I mean, the, the

10  plaintiff has pointed to and I'm certainly very much aware of

11  the Fourth Circuit's *Porter* decision which goes to this issue

12  about, you know, whether -- the fact that a government entity

13  has changed a practice that would otherwise be problematic

14  doesn't necessarily mean that the issue is moot unless there is

15  some kind of a guarantee or a very clear acknowledgement by the

16  government that it's not going to engage in such conduct in the

17  future.

18          What do we have in this record that would indicate to

19  the Court that the government has taken a position which would

20  strongly indicate that there's not going to be a change in this

21  policy prohibiting the DHS from using any of this information

22  to enforce the immigration laws?

23          MS. YANG:  Yes, Your Honor.  And I think in this

24  respect, it's important to consider both pieces of the MOA that

25  was originally challenged in this case.  As Your Honor is

1   aware, it contained both a fingerprinting requirement and then

2   also the separate information-sharing piece.

3          The fingerprinting requirement is that which is

4   solely within the control of, of HHS, of ORR, and in that

5   respect, that policy has been rescinded for nearly a year at

6   this point.  ORR has rearranged its program operations around

7   that change.  ORR's director and leadership have given sworn

8   testimony to Congress stating that they are in support of those

9   operational directives that made the change.  They have

10  indicated that they have no foreseeable intent of returning to

11  that fingerprint policy.

12         Counsel through our papers and here today, we are

13  making our presentation to the Court that ORR has no

14  foreseeable intent of returning to those policies.  In addition

15  to that agency action, Congress also has legislated that ORR is

16  not permitted to use any of its funds to rescind any of those

17  operational directives on its own.  So that's the

18  fingerprinting piece.

19         With respect to the information-sharing piece,

20  there's nothing that ORR can do to control the way that DHS

21  uses information, but the legislature has -- and as I noted

22  before, Congress has placed restrictions on the ability of DHS

23  to use that information for immigration enforcement.  So I

24  think --

25         THE COURT:  But that's only in place through the end

1   of December.

2          MS. YANG:  That's correct; however, any future

3   appropriations activity that -- any future restrictions that

4   Congress places on the appropriations that they, that they

5   provide and authorize for DHS, firstly, there's been no

6   indication that Congress would, would go back to -- would

7   remove the restrictions that they have so far imposed on DHS,

8   and it's, it's really going down the precarious path of

9   speculating about what the legislature might do, but in this

10  respect, I think there are a few things that make this case

11  different from the *Porter* case.

12         One of them is this, this additional element of

13  legislative action that additionally moves the issue beyond

14  just what the agency itself --

15         THE COURT:  All right, let me ask you about that

16  legislative action.  Was there any vigorous discussion of this

17  element of information sharing during the course of that

18  statute being enacted, in other words, within either the

19  congressional debates?  Was the issue clearly before the

20  legislators so that we can look at this legislation as truly

21  reflecting a reasoned consideration of the issue, or was it one

22  of these things, as we all know with federal legislation,

23  frequently there are little riders and little attachments that

24  practically no one has read and it gets passed and now that's

25  the law but no one really thought about it?

1          What do we have in the record indicating that this

2     was an issue that was significantly discussed, thought about,

3     and therefore one can say was, you know, seriously intended as

4     expressing congressional will?

5          MS. YANG:  I think we have the testimony involving

6     both DHS as well as HHS before the House Appropriations

7     Committee.  In fact, I believe that testimony at least by DHS

8     was one that the plaintiffs attached as an exhibit to their, to

9     their papers in which the information-sharing piece and the

10    alleged fears of immigration enforcement were discussed

11    extensively.

12         I also know that at least on behalf of HHS, its

13    director and its leadership have also participated in hearings

14    before the Appropriations Committee.  That also occurred in

15    July of this year.

16         THE COURT:  And how was the vote?  Was it unanimous

17    or was there -- was it one of these close votes?

18         MS. YANG:  I'm not sure, Your Honor.

19         THE COURT:  Does anybody know how the vote was on

20    that piece of legislation?  My understanding is on the

21    continuing resolution, it was not unanimous.  In fact, I think

22    it was a smaller margin than it has been in the past.  Am I

23    correct about that, that there were a fair number of dissenting

24    votes?

25         MS. WOLOZIN:  I don't know the exact count --

1          THE COURT:  Up --

2          MS. WOLOZIN:  I'm sorry.  I don't know the exact

3    count, Your Honor, but I do know it wasn't unanimous enactment,

4    and as to the continuing resolution, I'm not aware --

5          THE COURT:  All right.

6          MS. WOLOZIN:  -- but when it was initially placed.

7          THE COURT:  All right, go ahead.

8          MS. YANG:  There are a few other elements that I

9    wanted to discuss in which this case is different from that in

10   *Porter*, and one of them is, as I mentioned, the additional

11   piece of the legislative activity that separately missed the

12   issue, but a second one is that in *Porter*, the issue was the

13   underlying constitutionality of previous conditions of

14   confinement in a prison.

15          In this case, plaintiffs have never asked the Court

16   to find that it's unconstitutional in some way to require

17   fingerprints from sponsors, and I think, candidly, they would

18   be hard-pressed to do so because every state child welfare case

19   uses fingerprints in every case.

20          So, so I think that also is a distinction because

21   they're not asking that the underlying requirement of providing

22   fingerprints is somehow unlawful.  So I think that's also a

23   concern that was animating the court in *Porter*, where there was

24   a concern that absent some, some guarantee that the prison

25   would not return to those conditions, that somehow those

1    unconstitutional conditions would return.

2           And just as a, another note, with respect to

3    acquiring the injunction that plaintiffs are seeking in this

4    case, they bear the burden of showing that there's going to be

5    no significant threat of recurrence.  Our position is that

6    through the assurances that ORR has made, including the

7    assurances that counsel has made to this Court and that its

8    leadership has made to Congress, that ORR has no foreseeable

9    intent of returning to the fingerprinting policy, which really

10   just leaves us then at the end of the day with this

11   information-sharing practice between federal agencies.

12          And as Your Honor is aware from our briefing, the

13   Fourth Circuit earlier this year held that information sharing

14   on its own does not, does not bring any sort of agency action

15   that is subject to review under the APA, because information is

16   routinely shared among federal agencies.  That's part of how

17   the federal government works.

18          So at the end of the day, our position is that we're

19   really left with just information sharing and that the Fourth

20   Circuit has said very squarely that that's not an agency

21   action.

22          THE COURT:  But the problem in this particular case

23   is that the information sharing at least initially when this

24   case was first filed almost resulted in counterproductivity,

25   and that is, if the goal of ORR was to get these children

1    placed in a -- but by sharing the information without any

2    restrictions on what Homeland Security could do with the

3    information, in some cases, the fear was that otherwise

4    eligible sponsors became ineligible because they were going to

5    be deported or that they were being intimidated and therefore

6    not coming forward.

7            And so the information sharing was actually cutting

8    against ORR's interest in getting these kids placed, and so I

9    don't think this is exactly the same as just raw information

10   sharing.  It doesn't make sense that one agency would be

11   sharing information that could result in the agency being

12   frustrated in achieving its goals, and I think that was part of

13   the problem.

14           MS. YANG:  I would push back on, on that

15   characterization, Your Honor, and that's because again, this --

16   I think this is where the distinction between the fingerprint,

17   expanded fingerprint policy and the information sharing really

18   does matter, the distinction really does matter, because what

19   ORR observed was that there was a correlation certainly between

20   the amount of time that it took for household members to submit

21   their fingerprints and that that -- there was a correlation

22   between that requirement, the fingerprinting requirement, and

23   the amount of time the children were spending in care.

24           There was no similar finding in terms of the

25   information-sharing piece, and as we've learned from discovery,

1   there really was no -- the alleged effect of immigration

2   enforcement deterring sponsors from coming forward really

3   hasn't been borne out by the discovery in this case both with

4   respect to the individual sponsor plaintiffs themselves and

5   their own experiences but also in the undisputed data and the

6   undisputed expert testimony that's been taken in this case that

7   hasn't revealed any sort of general deterrence in terms of

8   sponsors coming forward.

9           So I think in that respect, it is important to

10  remember the distinction between the fingerprints and the

11  information sharing.  The fingerprints, which was the piece

12  that had a correlation to the increased length of care, that

13  has long -- no longer been the policy of ORR.  The

14  information-sharing piece that remains and that is really just

15  information sharing between federal agencies, as the *City of*

16  *New York* case recognized, really just leaves us without any

17  real material collateral effect that plaintiffs have been able

18  to demonstrate.

19          THE COURT:  All right, thank you.

20          MS. YANG:  Thank you.

21          THE COURT:  I'll hear from the plaintiff.

22          MR. GLENN:  Your Honor, with respect to mootness,

23  defendants have to show under *Porter* that there is an

24  unconditional and irrevocable agreement that they won't return

25  to the challenged conduct.  They have represented that they

1  have no foreseeable intent, and Your Honor can judge what that

2  means, but it sounds to us like that they keep open the

3  possibility of returning in the future if circumstances change.

4         There are a number of factors that show that they,

5  they do have an intent to resume the conduct.  First is that

6  the MOA has not been rescinded, even though ORR officials

7  testified that it should be and ORR has the authority under

8  section 10 of the MOA to rescind it with 30 days' notice,

9  without cause, unilaterally.

10        Second is that pursuant to the MOA, ORR continues to

11 share fingerprints with ICE in every case where fingerprints

12 are gathered, even though they are not using those

13 fingerprints.  That, that is an undisputed fact, 13 in our

14 plaintiffs' brief, Your Honor.

15        Another undisputed fact from our brief is that the

16 operational directives that rolled back some of, some of the

17 policies were intended to be temporary.  That's undisputed fact

18 11, Your Honor.

19        And finally, the funding restrictions are temporary.

20 They'll expire on December 20.  And *Renee v. Duncan* is the --

21 is most instructive on that point, that an appropriations bill

22 that temporarily constrains the agency action does not moot

23 that action going forward.

24        THE COURT:  All right, thank you.

25        All right, let me see if I have any other questions

1   or any other issue that I want to raise.  There has been in the

2   course of this case some concern about the different categories

3   of sponsors, and I am curious, I guess this question again is

4   for the defendants, what's the rationale ORR has used for

5   providing different levels of notice and appeal rights to

6   Category 1 versus Category 2 sponsors?

7           MS. YANG:  Certainly, Your Honor.  The rationale is

8   that ultimately at the end of the day, constitutional due

9   process is particularized to the circumstances of the cases,

10   and in ORR's view and as is reflected in state child welfare

11   practice, parents have fundamental rights to the upbringing of

12   their children.  ORR recognizes those rights, and so it's

13   provided -- in addition to the process that it provides during

14   the sponsorship application process, ORR has chosen to provide

15   an additional hearing at the end of that process if a parent is

16   denied, in full recognition that in state law and in state

17   jurisdictions, parents are given that fundamental right to

18   their children.

19          That same right is not recognized either under

20   federal standards or state standards with respect to nonparent

21   relatives; and so the rationale really is first that, that

22   there's a difference in the rights, in the legal protections

23   that are available for parents versus nonparents; and secondly,

24   that when you start expanding constitutional due process out in

25   this manner, that increases the burden on the agency.

1              As Your Honor is familiar from our papers, the way

2      that these hearings are conducted is that the assistant

3      secretary of Health and Human Services presides over the

4      hearing, and the individual federal field specialist who made

5      the decision in the case appears and testifies and basically

6      explains why he or she made the decisions that they did.

7              By expanding these types of hearings out to

8      categories of relatives or other adults who in state, in state

9      law don't have the same recognized right imposes an additional

10     burden on ORR by taking resources away from those FFSs who

11     continue to have the same caseloads, continue to need to review

12     individual cases, make release decisions, consult with the case

13     managers who are handling those cases, and by taking their

14     attention away from those individual cases to testify in

15     hearings, we don't believe actually serves the interests of

16     either the program or the children who ORR is trying to place

17     safely with sponsors.

18              THE COURT:  All right.  Do you want to respond to

19     that?

20              MS. WOLOZIN:  Yes, Your Honor.

21              THE COURT:  Yes.

22              MS. WOLOZIN:  First of all, as a matter of fact shown

23     in our evidence, there have been absolutely no appeals under

24     the current process, and so the argument that it is overly

25     burdensome is based on some hypothetical that has actually

1    never taken place, because a Category 1 sponsor has never

2    either had the inclination or opportunity to take advantage of

3    that appeals process, and part of the reason that that is the

4    case is because ORR argues that it should have unlimited

5    discretion in the scope of its investigations and in the time

6    it takes to conduct those investigations, and that only when it

7    decides it has a final decision are there any procedures

8    available even to a Category 1 sponsor.

9              THE COURT:  Okay.

10             MS. WOLOZIN:  A second brief note, Your Honor, is

11   that while there may be a difference between a Category 1 and

12   Category 2 sponsors in terms of the weight of the

13   constitutional interest, the child certainly has an equally

14   strong interest in liberty, regardless of whether it is a

15   Category 1 or a Category 2 sponsor, and so there's not a good

16   rationale for only providing process to those whose parents

17   happen to be the ones that are trying to get them out.

18             THE COURT:  All right.  Now, the bottom line, though,

19   appears to be from the evidence you-all have presented, is that

20   the time in which the children are being kept in ORR custody

21   has significantly decreased and is now, as I understand it,

22   well under even the 60 days, which was considered sort of the

23   rational limit.  Everybody originally felt more than 60 days

24   was not good, and I think it's down to, what, 30 or 40.  I

25   mean, it's down significantly.

1          I want to see what -- how you respond to that in

2    terms of whether or not the plaintiffs, by having initially

3    filed this lawsuit, have not actually achieved essentially what

4    you really were trying to get, which was a shortened time

5    period.

6          MS. WOLOZIN:  Your Honor, this lawsuit is about the

7    children who are not released within that time frame.  We're

8    very happy that more children are being released faster;

9    however, 20 percent of the population by defendants' own data

10   are not released within 60 days; and for those children who are

11   not released within that time frame, even excluding -- using

12   the class list, even excluding those in federal foster care,

13   their average time in custody is 172 days; and due process is

14   to protect those children in the difficult cases where they are

15   having to wallow in custody waiting for decisions, where

16   there's just no process to protect them once very weighty

17   constitutional interests come into play.

18          We also included, I forget exactly which exhibit, but

19   for children in custody over 50 days, which was another metric

20   we found ORR tracks through discovery, those children likewise

21   had an average time in custody over 100 days.

22          And so for the children, the 20 percent of children

23   that are in ORR custody, they are nowhere near the 30-day total

24   population goal, and some of them -- many of them, as we've

25   shown through the certified class, have Category 1 or

1  Category 2 sponsors.

2          And it's especially for those children who are stuck

3  where it's not going smoothly, where procedural due process

4  rights are so important and it is so important to protect their

5  rights and their families' rights.

6          THE COURT:  All right.  I want to hear a response to

7  that.

8          MS. YANG:  As Your Honor noted, the average length of

9  care for children in the many months before today has gone down

10  significantly.  Now, plaintiffs point to the 20 percent across

11  the program, I should note, that do remain in care for more

12  than 60 days, and really, I think, I think this argument rests

13  on at least one fundamental incorrect assumption, which is that

14  that amount of time is attributable to ORR, in other words,

15  that ORR has caused that deprivation, but as we've argued in

16  our papers and as we've supported with the exhibits attached to

17  our papers, ORR is not -- there cannot be a bright line rule

18  that says ORR is responsible for -- is solely responsible for

19  the amount of time that children spend in care.

20          If I could give a few examples that maybe would

21  demonstrate this to the Court, the way that plaintiffs define

22  the issue would include -- would reach the conclusion that ORR

23  has deprived the due process rights for a child who is in ORR

24  custody for 59 days and then on day 60 identifies a sponsor.

25          Under that -- under those sets of circumstances, they

1    would still be included in the class as it's been defined in

2    this case, but I don't think that the conclusion could follow

3    that ORR has deprived them of any procedural due process.

4            Similarly, we have instances from the plaintiffs in

5    this -- the named plaintiffs in this case as well as the absent

6    class members where a child has identified a sponsor who

7    initially says they will apply but then they become

8    nonresponsive or they become nonresponsive for a certain period

9    of time, and during that time, ORR reaches out to them, follows

10   up to them, tries to get them to participate, but for whatever

11   reason, and it can be entirely benign, life getting in the way,

12   any other number of reasons, the sponsor chooses either not to

13   respond or removes themselves from the process.  Again, in that

14   circumstance, I don't think the conclusion can follow that ORR

15   has somehow deprived the child of due process.

16           So I think that's one very fundamental element that's

17   been glossed over in the briefing, but it is significant in

18   terms of figuring out whether ORR has caused a deprivation in

19   any sense.

20           THE COURT:  All right, thank you.

21           Did you want to respond to that?

22           MS. WOLOZIN:  Yes, Your Honor.  First, I would note

23   that in terms of the named plaintiffs, all sponsors came

24   forward nearly immediately, and this is one -- this sort of

25   disappearing or nonresponsiveness is one way in which all of

1    the counts in this case are intertwined because many of the

2    examples that defendants are referring to were resulting from

3    fear generated by the ICE sharing policy, and so sponsors were

4    unable to complete sponsorship applications or unable to

5    convince household members to complete them, and so I wanted to

6    flag for the Court that these are interrelated.

7            Second, at defendants' insistence, we included a

8    hypothetical remedy to show that it is possible to account for

9    these variations in families and for variations in sponsor

10   responsiveness, and so I'll note that in our example, we noted

11   perhaps a hearing would only be available to sponsors who have

12   completed a sponsorship reunification packet.  In that case, if

13   a sponsor comes forward on day 59 and has not yet submitted a

14   sponsor reunification packet, in this hypothetical, there

15   wouldn't be a hearing.

16           And so while defendants are best placed to determine

17   the proper procedure, we offer that example as a way to show

18   that there are ways to target relief within their procedural

19   designs specifically to the situations in which there is a very

20   strong interest and right to be heard and protected.

21           THE COURT:  All right.

22           MS. YANG:  Your Honor, may I very quickly --

23           THE COURT:  Yes, ma'am, go ahead.

24           MS. YANG:  Thank you, Your Honor.  And I'll very

25   quickly just note that plaintiffs' response just now indicated

1    that the reason the names -- the named sponsor plaintiffs

2    delayed in providing information was because of fears of

3    immigration enforcement.  Respectfully, Your Honor, as we've

4    laid out in our papers, the evidence -- their testimony at

5    deposition under oath does not support that fact.  So I wanted

6    to point that out.

7         I will be the first to admit that there are some

8    cases where there are household members who do not want to be

9    fingerprinted.  Again, the fingerprinting and the threat of --

10   or the fear of immigration enforcement are separate, and as

11   we've laid out in our papers, there's been no specific showing

12   that any, any fears of immigration enforcement were

13   specifically due to the issues that are, that are challenged in

14   this particular case.

15        THE COURT:  All right.  Well, obviously, we're going

16   to take this matter under advisement.  These are serious issues

17   in these motions, and the record is fairly dense.

18        I would be interested, though, since it happened

19   yesterday and that was not in either of your briefs, both sides

20   are invited to provide the Court with more data, information

21   about what went on with any discussions in the continuing

22   resolution, and in particular, I am concerned because the

23   mootness issue is, I think, a significant issue in this case.

24   It certainly is significantly argued by the defendants.

25        And it is a strange situation where we have, you

1    know, the -- you can't predict what Congress is going to do,

2    and obviously, the political environment keeps shifting.  It

3    may be very different in a year one way or the other, and so we

4    have to look at this case very carefully.  But I would be

5    interested in seeing what at least the current discussion of

6    this issue is on the legislative level, and so since we just

7    had action yesterday, I would be interested in that, all right?

8              Nothing further then, we'll recess court.

9              MR. SANDOVAL-MOSHENBERG:  Your Honor?

10             MR. BARGHAAN:  Your Honor?

11             THE COURT:  Yes, Mr. Barghaan?  Was there a question?

12             MR. BARGHAAN:  I was going to ask exactly the same

13   thing, so --

14             THE COURT:  In terms of time?

15             MR. BARGHAAN:  May we have two weeks from today to

16   file?

17             THE COURT:  Yes.  14 days from today, yes, 14 days.

18   Congress may do something in the interim, too, so be careful.

19             All right, we'll recess court until 11:00.

20                            (Which were all the proceedings

21                             had at this time.)

22                   CERTIFICATE OF THE REPORTER

23       I certify that the foregoing is a correct transcript of

24   the record of proceedings in the above-entitled matter.

25   _____
                          /s/
                     Anneliese J. Thomson