IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| J.E.C.M., a minor, by and through his next friend JOSE JIMENEZ SARAVIA, et al., | ) ) ) | |
| Plaintiffs/Petitioners, | ) ) | 1:18-cv-903 (LMB/IDD) |
| v. | ) ) | **REDACTED VERSION** |
| ROBIN DUNN MARCOS, Director, Office of Refugee Resettlement, et al., | ) ) ) | |
| Defendants/Respondents. | ) | |

MEMORANDUM OPINION

This civil action involves the policy and procedures governing the release of

"unaccompanied children" ("UCs") in the custody of the Office of Refugee Resettlement

("ORR"), a division of the U.S. Department of Health and Human Services ("HHS"). UCs are

minors who have arrived with "no lawful immigration status in the United States." 6 U.S.C.

§ 279(g)(2)(A). Congress has charged ORR with the "care and custody" of UCs, which includes

placing a UC with a "custodian," often referred to as a "sponsor," who is typically a relative

residing in the United States. Id. § 279(b)(1); 8 U.S.C. § 1232(b)(1), (c)(3). ORR is required to

"promptly place[]" UCs "in the least restrictive setting that is in the best interest of the child." 8

U.S.C. § 1232(c)(2)(A). This requirement means that the agency must determine that the

proposed sponsor "is capable of providing for the child's physical and mental well-being." Id.

§ (c)(3)(A). During the period in which ORR investigates a proposed sponsor, the UC remains

in ORR custody. ORR Unaccompanied Children Program Policy Guide: Section 2, § 2.2.1,

Office of Refugee Resettlement, https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-

children-program-policy-guide-section-2#foot1 (last updated Aug. 8, 2023) [hereinafter Policy

Guide].[1]  It is this period of time—from when a potential sponsor requests to sponsor a child and

is investigated, until the child is released—that is the focus of this lawsuit.

Plaintiffs allege that, since 2018, when this litigation was first started, UCs have been

held for prolonged periods of detention in Virginia because ORR's policy and procedures for

investigating potential sponsors have created unnecessary delays.  Early in the litigation,

plaintiffs' claims centered on a policy governing how biometric data—such as fingerprints—that

ORR collected as a part of the reunification process would be shared among government

agencies.  This policy, memorialized in a Memorandum of Agreement ("MOA") executed

between ORR and other government agencies, required ORR to "provide [Immigration and

Customs Enforcement] with the name, date of birth, address, fingerprints . . . and any available

identification documents or biographic information regarding the potential sponsor and all adult

members of the potential sponsor's household."  [Dkt. No. 242-2].  Plaintiffs argued that this

policy deterred would-be sponsors from submitting family reunification applications due to

concerns about immigration consequences.  [Dkt. No. 242] at 10.  On March 12, 2021, HHS and

DHS rescinded the MOA, recognizing that it had "undermined the interests of children and had a

chilling effect on potential sponsors" of UCs.  [Dkt. No. 322-1] at 2.  As a result, on June 16,

2021, the Court granted plaintiffs' motion to voluntarily dismiss all claims relating to the MOA.

[Dkt. No. 331].

---

[1] The versions of the Policy Guide attached to the parties' cross-motions for summary judgment
were up to date as of July 15, 2019 and August 6, 2019, respectively.  [Dkt. Nos. 242-10, 254-2].
The Court has taken judicial notice of the current Policy Guide, which can be found on HHS's
public website, see United States v. Garcia, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and
numerous others routinely take judicial notice of information contained on state and federal
government websites."), and the parties have revised their positions to address the current
version.

Before the Court are the parties' cross-motions for summary judgment on the sole remaining claim in this civil action: that ORR's current procedures for reuniting UCs with family members of the first and second degree still violate the procedural due process rights of UCs and potential sponsors. Specifically, plaintiffs contend that the following three changes to ORR's policy and procedures are constitutionally required to provide sufficient due process protections for minors and potential sponsors. First, plaintiffs request expansion of the categories of minors and potential sponsors who would be eligible to appeal a formal denial of a sponsorship application. Second, although ORR internally reviews all pending applications to sponsor a UC when the minor has been in custody for 90 days, plaintiffs request a formal review of all applications that have been pending for 60 days. Third, plaintiffs request that, when making release decisions, ORR explicitly consider the detrimental effect that time spent in custody can have on minors. For the reasons explained in this opinion, ORR's recent amendments to its policy and procedures provide UCs and potential sponsors all the process they are due. Accordingly, defendants' Motion for Summary Judgment will be granted and plaintiffs' Motion for Summary Judgment will be denied.

## I. BACKGROUND

### A. **Statutory and Regulatory Background**

Although this litigation primarily addresses plaintiffs' procedural due process concerns relating to the ORR Policy Guide, an overview of the legal framework governing the Policy Guide is necessary. This framework "consist[s] primarily of two statutory provisions—§ 279 of Title 6 and § 1232 of Title 8—plus a settlement agreement that is binding on the pertinent federal agencies." D.B. v. Cardall, 826 F.3d 721, 731 (4th Cir. 2016).

Before 2003, Congress had charged the Immigration and Naturalization Service ("INS") with the care and custody of UCs. D.B., 826 F.3d at 731–32. In 1985, several UCs in INS

3

custody filed a class action challenging the policies regarding their detention. Id.; see Reno v. Flores, 507 U.S. 292 (1993). After twelve years of litigation, the parties entered into a settlement agreement known as the "Flores Agreement," which remains binding on all of INS's successor agencies, as well as ORR. D.B., 826 F.3d at 732. The Flores Agreement "established a 'nationwide policy for the detention, release, and treatment of minors in the custody of the INS,'" including "a general policy favoring less restrictive placements" of UCs and "release" of UCs "rather than detention." Id. (quoting the Flores Agreement). The Flores Agreement also "contemplate[d]" that UCs "must be released 'without unnecessary delay,' preferably to a parent or legal guardian," although the relevant agency may "require a 'positive suitability assessment' before releasing the child to the custody of any individual." Id. (quoting the Flores Agreement).

In 2002, Congress enacted the Homeland Security Act ("HSA"),[2] which abolished the INS and transferred the majority of its functions—including border patrol—to the Department of Homeland Security ("DHS"); however, the HSA "carved out" of that transfer "[a]ll functions with respect to the care and custody of UCs," which were instead transferred to ORR, an agency of HHS. D.B., 826 F.3d at 732 (quoting 6 U.S.C. § 279(a)). The HSA set out ORR's responsibilities as to the care and custody of UCs, including the coordination and implementation of placement determinations. Id. at 732–33; see also 6 U.S.C. § 279(b)(1).

In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), which "delineated when [ORR] can release a [UC] to the custody of a third party." D.B., 826 F.3d at 733. The TVPRA prohibited ORR from releasing UCs to third parties, including proposed sponsors, until ORR had determined that the proposed

---

[2] The HSA became effective 60 days after its passage on November 25, 2002, meaning that ORR did not become responsible for the care and custody of UCs until 2003. Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat 2135 (2002).

sponsor was "capable of providing for the [UC's] physical and mental well-being." Id.; 8 U.S.C.
§ 1232(c)(3)(A). In 2014, a criminal investigation revealed that HHS had placed several dozen
UCs "in the hands of a ring of human traffickers who forced them to work on egg farms in and
around Marion, Ohio," an incident which ultimately led to a federal criminal indictment, a
congressional investigation, and several policy reforms. [Dkt. No. 231-2] at 346, 369–70. After
this incident, ORR imposed stricter procedures for conducting background checks and home
studies by, for example, requiring background checks to be performed for any adults living in the
proposed sponsor's household. Id. at 361, 371.

**B. ORR Policy Guide**

This litigation focuses on Section 2 of the ORR Policy Guide ("Policy Guide"), a
document that governs the release of UCs to sponsors by setting out procedures "to ensure [UCs]
in ORR care are released in a safe, efficient, and timely manner." Policy Guide, § 2.1.[3] ORR's
UC Manual of Procedures ("MAP") contains relevant internal guidance for ORR Staff,
Contractors, and Grantees as to how to implement the ORR Policy Guide.[4]

The Policy Guide explains that ORR "has grouped UC cases into the following
categories" based on the identity of the proposed sponsor:

> Category 1: Parent or legal guardian. This includes qualifying step-parents that
> have legal or joint custody of the child or teen.
> Category 2A: A brother; sister; grandparent or other immediate relatives (e.g., aunt,
> uncle, first cousin) who previously served as the UC's primary caregiver. This
> includes biological relatives, relatives through legal marriage, and half-siblings.

---

[3] The ORR Policy Guide has changed frequently over the course of this litigation. By September
15, 2019, the date on which plaintiffs last viewed the Policy Guide before submitting their
Motion for Summary Judgment, the plaintiffs calculated that "19 of the 39 subsections in Section
2 have been revised since June 2018, and 15 have been revised since the start of discovery in this
case." [Dkt. No. 242] at ¶ 19. Since September 2019, ORR has amended the Policy Guide many
more times. Policy Guide § 2.

[4] The operative MAP, last updated on March 28, 2023, was filed under seal on June 26, 2023.
[Dkt. No. 360].

Category 2B: An immediate relative (e.g., aunt, uncle, first cousin who was not previously the UC's primary caregiver. This includes biological relatives, [and] relatives through legal marriage.

Category 3: Other sponsor, such as distant relatives and unrelated adult individuals[.]

Category 4: No sponsor identified[.]

Policy Guide § 2.2.1 (emphasis in original). ORR will release a UC to a sponsor "in the following order of preference: . . . parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody." Id.

The sponsorship evaluation process involves three primary participants. First are the "Case Managers," who are employees who work for an "ORR care provider," which is an ORR funded facility that houses and cares for the UCs. Id. §§ 2.2.1, 2.3. Case Managers "communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator." Id. § 2.3. "Case Coordinators" are non-governmental contractors who "concurrently review all assessment information on a [UC] and sponsor to also make a recommendation." Id. "Once Case Managers and Case Coordinators agree on a particular recommendation for release," Federal Field Specialists ("FFSes"), on behalf of ORR, make "a final release decision." Id. "FFS[es] are ORR's field staff located regionally throughout the country and are assigned to a group of care providers within a particular geographic region." Id. § 2.3.1. "If the Case Manager and Case Coordinator cannot agree on a recommendation, the case is elevated to the [FFS] for further guidance." Id. § 2.3. Two other individuals, an FFS

6

Supervisor and a Contract Field Specialist, sometimes participate in determining whether a UC can be released from ORR custody. An FFS Supervisor oversees the actions of FFSes, and ensures that FFSes comply with ORR's policy and procedures. [Dkt. No. 254-5] at 4–5. Contract Field Specialists cannot make final decisions as to a UC's release, but instead primarily assist with administrative matters, such as providing birth certificates to consulates to verify their validity. Id. at 4.

The Policy Guide also explains the multistep process for securing a UC's release to a potential sponsor, including details needed in the sponsor application, the considerations involved in ORR's suitability assessment, which includes a background check, and the criteria for the release decision. The sponsorship process begins with a sponsor's application, called a "[f]amily [r]eunification [p]acket." Policy Guide § 2.2.3. Care provider staff are "available to help the potential sponsor complete the application." Id. Potential sponsors must complete and submit the application, and "must provide documentation of identity, address, and relationship to the child they seek to sponsor," as well as documents verifying the UC's identity and the identity of all adult household members. Id. § 2.2.4. Potential sponsors must also disclose if they "ha[ve] been charged with or convicted of any crime or investigated for the physical abuse, sexual abuse, neglect, or abandonment of a minor." Id.

Under the current Policy Guide, the potential sponsor and all of their adult household members must undergo a background check. Id. § 2.5. Staff members may begin to conduct these checks as soon as they receive the potential sponsor's and adult household member's photo identification, which should occur even before the entire family reunification packet is submitted. MAP at 13, 26–27. "The type of background checks performed on a sponsor and adult household members is dependent in part on the sponsor's relationship, if any, with the

7

child." Policy Guide § 2.5. All sponsors in Categories 1, 2A, 2B, and 3, and adult household members undergo a public records check and a sex offender registry check. Id. § 2.5.1. Additionally, Category 2B and 3 sponsors must submit their fingerprints and undergo an FBI National Criminal History Check. Id. Category 1 and 2A sponsors, as well as all adult household members regardless of sponsor category, must submit their fingerprints and undergo a FBI National Criminal History Check only if there is a specific concern or when the sponsor's application is referred for a home study. Id. "In cases that require a home study, and cases where a special concern is identified," all sponsors and adult household members must undergo a child abuse and neglect check ("CA/N Check"). Id. Lastly, "when there is an unresolved criminal arrest or [criminal] issue that is still in process," all categories of sponsors and adult household members must undergo a state criminal history repository check or a local police check. Id. Background checks are used by ORR to ensure the safe release of a UC to a proposed sponsor. "In the event that a background check . . . reveals criminal history or a safety risk, the care provider and ORR evaluate this information and request [that] the potential sponsor . . . provide any additional information that may demonstrate [his or her] ability to provide for the child's physical and mental well-being." Id. § 2.5.2.

After a potential sponsor submits a completed application, ORR evaluates the "potential sponsor's ability to provide for the physical and mental well-being of the [UC]" by considering a number of listed assessment criteria. Id. § 2.4 (listing 11 factors). As part of the suitability assessment, ORR determines whether to conduct a "home study," which consists of a home visit and in-person interviews with the proposed sponsor and any adult household members. Id. § 2.4.2. Both the TVPRA and ORR require a home study under various circumstances, and ORR may require a home study at its discretion if the Case Manager and Case Coordinator agree that

8

it "is likely to provide additional information required to determine that the sponsor is able to care for the health, safety, and well-being of the child" and if the FFS approves. Id. § 2.4.2 & n.6. Providers who conduct a home study are not ORR-staff members. They write a report of their findings and make an initial recommendation regarding the UC's release. Id. § 2.4.2.

An FFS makes the final release decision considering the home study provider's recommendation, if applicable, along with the recommendations of the Case Manager and Case Coordinator. Id. § 2.7. There are multiple instances in which release will be denied to Category 2 or 3 sponsors and may be denied to Category 1 sponsors, including when a potential sponsor or a member of a potential sponsor's household has been convicted of certain felony or misdemeanor offenses. Id. § 2.7.4. Regardless of the potential sponsor's category, release of a UC will be always be denied if: "[t]he potential sponsor is not willing or able to provide for the child's physical and mental well-being," "[t]he physical environment of the home presents risks to the child's safety and well-being," or "[r]elease of the [UC] would present a risk to him or herself, the sponsor, household, or the community." Id.

To deny a UC's release to a Category 1 or 2 potential sponsor, the FFS must complete a form recommending denial, "which includes a section summarizing the findings, such as home study results, police report results, if applicable, and other information." MAP at 85. This recommendation must be reviewed by five other individuals, including the FFS supervisor and the ORR Director. Id. If ORR denies a sponsor application submitted by a Category 1 or 2 potential sponsor, the potential sponsor is provided with a formal written denial, which includes "[an] explanation of the reason(s) for the denial," "[i]nstructions for obtaining a copy of the child's case file," "[e]vidence and information supporting ORR's denial decision," and "[i]nstructions for requesting an appeal of the denial." Policy Guide § 2.7.7. If ORR denies a

sponsor application in a Category 3 case, the proposed sponsor is notified by telephone and provided with the reasons for denial. Id. If the sole reason for any denial is that the UC is a danger to himself or herself, the sponsor, household, or the community, the UC is also notified in writing. Id. A Category 1 or 2 potential sponsor who receives a formal denial can appeal the decision to the Assistant Secretary for Children and Families or a neutral and detached designee[5] ("AS/NDD") within 30 business days of receipt of the denial letter; however, a Category 3 potential sponsor cannot appeal a denial. Id. § 2.7.8. If the sole reason for any denial is that the UC is a danger to him or herself, the sponsor, the household, or the community, the UC may appeal the decision in the same manner as a Category 1 or 2 potential sponsor. Id. If a UC has been in custody for 90 days, and there is a pending sponsor application, ORR conducts an internal review "to identify and resolve the reasons that a family reunification application remains pending in a timely manner." Id. § 2.7.9. ORR will continue to conduct additional reviews every 90 days if a UC has not been released. Id.

## C. Procedural Background

The original named plaintiffs in this civil action included four UCs who had been in ORR's care for longer than 60 days and their proposed sponsors.[6] Thirteen-year-old J.E.C.M.

---

[5] ORR is an office within the Administration for Children and Families, which is within HHS. Policy Guide § 2.

[6] Although the individual claims of all named plaintiffs have been dismissed as moot, their experiences are illustrative of the types of concerns plaintiffs have with the reunification process. This dismissal occurred before the Court certified the class; however, it did not moot the putative class claims because of the inherently transitory nature of the claims of individual named plaintiffs. See Nielsen v. Preap, 139 S. Ct. 954, 962–63 (2019) (plurality opinion) (reaffirming, in a context in which detained noncitizens asserted class claims but were granted bond hearings or cancellation of removal "by the time of class certification," that "the fact that a class 'was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction' when . . . the harms alleged are transitory enough to elude review" (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 52 (1991))). Although defendants have preserved this

entered ORR custody on February 27, 2018 after fleeing Honduras. [Dkt. No. 19-1] at ¶ 3; [Dkt.

No. 103-1] at ¶ 2. Jose Enrique Jimenez Saravia, J.E.C.M.'s brother-in-law,[7] applied to sponsor

J.E.C.M. Id. Several adult members of Saravia's household, including ████, who was

Saravia's wife and J.E.C.M.'s sister, were unwilling to provide their fingerprints to ORR out of

concern for potential immigration consequences. [Dkt. No. 268-2] at 53:3–23; 75:15–76:24.

J.E.C.M. was ultimately released to Savaria's custody on July 26, 2018, [Dkt. No. 19-1] at ¶ 11;

████████████████████████████████████████████

████████████████████████████████ [Dkt. No. 248-6] at 19:12–

20:12.

    B.G.S.S. was seventeen-years old when he entered ORR custody on May 11, 2018, after

travelling from Guatemala. [Dkt. No. 248-9] at 4. In June 2018, B.G.S.S. was transferred to the

Shenandoah Valley Juvenile Center in Staunton, Virginia for various behavioral issues, including

making threats and because he was a flight risk. Id. at 5. Blanca Jeronimo Sis ("Jeronimo Sis"),

B.G.S.S.'s half-sister, applied to sponsor him. Id. at 2. It took Jeronimo Sis several months to

provide certain required documents, such as a proof of address and fingerprint information from

members of her household. Id. at 3, 5, 7; [Dkt. No. 248-11] at 6, 9–10, 13; [Dkt. No. 118] at 2–

---

issue for appeal, they did not challenge it at the class certification stage in light of "the status of
the authority." [Dkt. No. 123] at 31 n.14.

[7] The parties refer to Saravia as J.E.C.M.'s sister's "partner" in their memoranda in opposition to
and support of their cross-motions for summary judgment, [Dkt. No. 268] at ¶ 28; [Dkt. No. 248]
at ¶ 28, and a declaration signed under the penalty of perjury from an ORR FFS attached to
defendants' opposition to the initial class certification motion classified Saravia as a Category 3
sponsor, [Dkt. No. 19-1] at ¶ 16; however, in a declaration signed under the penalty of perjury
submitted with the plaintiffs' Renewed Motion for Class Certification, Saravia asserted that he
was J.E.C.M.'s sister's husband, which would make him a Category 2 sponsor. [Dkt. No. 103-2]
at ¶ 2; see Policy Guide § 2.2.1 (defining Category 2A sponsors as a "brother" or "sister" which
"includes . . . relatives through legal marriage."). Defendants did not contest this fact in their
opposition to plaintiffs' Renewed Motion for Class Certification. [Dkt. No. 123] at 10.

3. Additionally, the Case Manager noticed that when phone contact was made, an unidentified adult man answered the phone, even though Jeronimo Sis had never told the Case Manager that she lived with a man. [Dkt. No. 248-9] at 4, 6–7. Because of B.G.S.S.'s behavioral issues, a discretionary home study was ordered in October 2018, after which a negative recommendation was made. [Dkt. No. 119]; [Dkt. No. 103-3] at ¶ 10. Jeronimo Sis ultimately withdrew her sponsor application in December 2018. Id. B.G.S.S. then identified another potential sponsor, ███████████████, B.G.S.S.'s niece,[8] whom he had never previously mentioned to ORR. [Dkt. No. 85-1] at ¶ 4; [Dkt. No. 248-8] at 68:7–19, 69:20–22. B.G.S.S. was released into her custody on January 19, 2019, approximately 15 days after she completed the family reunification application. See [Dkt. No. 248-8] at 95:16–23; [Dkt. No. 85-1] at ¶ 4. ███████████████

████████████████████████████████████████

██████████████████████ [Dkt. No. 249-1] at 87:6–10. B.G.S.S. moved out of Jeronimo Sis's home, claiming she required him to pay rent, repay a debt, and buy his own food. [Dkt. No. 248-8] at 106:15–107:9. He then moved in with a cousin, moved back in with Sis Sis, and finally moved to Michigan. Id. at 108:15–25; [Dkt. No. 249-1] at 81:5–7.

Fifteen-year-old R.A.I. entered ORR custody on April 22, 2018 after travelling from Honduras. [Dkt. No. 248-2] at 4. Sandra Alvarado Guerra ("Alvarado"), R.A.I.'s half-sister, who had been R.A.I.'s primary caregiver in their home country, applied to sponsor her. [Dkt. No. 248-2] at 69; [Dkt. No. 271] at 17:22–19:12. Alvarado had come across the border with R.A.I., and was living with an acquaintance who she had met for the first time in person upon arriving in the United States, as well as with other adults with whom she had no previous relationship. [Dkt. No. 103-4] at ¶ 3; [Dkt. No. 271] at 39:5–25, 49:25–50:15. Because she

---

[8] ████ is not a named plaintiff in this action.

believed that her adult housemates would not agree to provide identification to ORR out of a fear of immigration consequences, she did not ask them to do so.  [Dkt. No. 271] at 50:1–51:18, 78:17–79:5.  Eventually, in mid-July 2018, Alvarado moved to a new residence that would provide R.A.I. with her "own space."  Id. at 54:6–15.  Alvarado testified that she became "desperate" when the shelter workers told her that they were planning to give R.A.I. up for adoption if Alvarado "didn't fulfill all their requirements."  Id. at 55:18–20.  She claimed that she filled out all the papers to sponsor R.A.I. in just "days."  Id. at 57:5–9.  A discretionary home study was ordered because ORR staff expressed concerns about Alvarado's ability to care for R.A.I. given that she was also a new arrival in the United States and had recently given birth.  [Dkt. No. 248-2] at 70.  Alvarado was notified of the home study about two weeks before it took place, and a positive recommendation was made after the home study.  [Dkt. No. 271] at 80:10–17; [Dkt. No. 248-2] at 91–92.  R.A.I. was ultimately released to Alvarado's custody in mid-October 2018.  [Dkt. No. 103-4] at ¶ 12.

Fourteen-year-old K.T.M. entered ORR custody on March 31, 2018 after travelling from Honduras.  [Dkt. No. 248-3] at 4.  Cynthia Velasquez Trail, K.T.M.'s half-sister, who had grown up with him, applied to sponsor K.T.M.  [Dkt. No. 240-13] at 139; [Dkt. No. 268-4] at 17:18–20, 19:20–20:2.  K.T.M.'s case manager recommended that ORR conduct a home study because of reported physical abuse K.T.M. experienced in Honduras.  [Dkt. No. 240-13] at 139–40.  The home study, which was conducted on July 13, 2018, resulted in a positive recommendation and was reported on July 29, 2018, id.; however, because one of the adult members of Trail's

household delayed providing fingerprints to ORR,[9] K.T.M. was not released to Trail's custody until September 29, 2018. Id. at 139–41.

At oral argument on June 23, 2023, defendants represented that the class at that time consisted of three children. One UC had been in ORR's care for approximately two years, but will turn 18 within 90 days of the oral argument and will, accordingly, be released from ORR's care at that point. This UC's release has been delayed for a number of reasons, including being moved to different ORR facilities and having had multiple proposed sponsors, one of whom had to undergo a mandatory home study. The other two UCs had been in ORR's care for less than six months, and both had family reunification applications from proposed sponsors in progress.

This civil action was originally filed on July 20, 2018 as a single habeas petition on behalf of J.E.C.M. [Dkt. No. 1]. The next day, a First Amended Class Action Complaint and Petition for a Writ of Habeas Corpus was filed, expanding the civil action to seek class-wide relief. [Dkt. No. 4]. Because J.E.C.M. was released to his family approximately a week later, on August 16, 2018, plaintiffs filed a Second Amended Class Action Complaint and Petition for a Writ of Habeas Corpus, which added the additional named plaintiffs as class representatives. [Dkt. No. 21].

On September 21, 2018, defendants filed a Motion to Dismiss for lack of jurisdiction and for failure to state a claim. [Dkt. Nos. 35, 36]. The Court granted the motion to dismiss in part as to the individual claims of three minor named plaintiffs who had, by then, been released from ORR custody and as to their sponsors who were also named plaintiffs. [Dkt. Nos. 60, 61]. The Court also dismissed the substantive due process claim, but denied the motion as to the

---

[9] The household member had "misplace[d] her Civic Core identification document" which delayed her fingerprinting until August 2018. [Dkt. No. 240-13] at 140; [Dkt. No. 248-5] at 37:21–25.

14

procedural due process claim, the claim for violation of the TVPRA, and various allegations concerning the MOA's alleged unlawful information-sharing arrangement between ORR and other government agencies. Id.

On February 22, 2019, plaintiffs filed a Third Amended Class Action Complaint and Petition for a Writ of Habeas Corpus [Dkt. No. 93], which remains the operative complaint and which alleges four substantive counts: Violation of the TVPRA (Count I); Violation of Procedural Due Process (Count II); Violation of the Administrative Procedure Act ("APA") for failing to adhere to the notice and comment process when promulgating information-sharing practices in the MOA (Count III); and Violation of the APA by engaging in arbitrary and capricious agency action (Count IV).[10] On March 19, 2019, the Court granted defendants' Partial Motion to Dismiss the individual claims of all the named plaintiffs, as all of the minor named plaintiffs had been released from ORR custody. [Dkt. Nos. 109, 110, 113].

On April 26, 2019, the Court certified the following two classes, as amended on May 2, 2019:

> (1) Minor Class: All children designated as unaccompanied alien minors
>> (a) who were, are being, or will be held in the custody of the Office of Refugee Resettlement ("ORR") anywhere in Virginia at any date on or after July 20, 2018, including those subsequently transferred to an ORR-operated or -contracted facility outside Virginia;
>> (b) who have been or will be held in ORR custody for 60 days or more;
>> (c) for whom a member of the Sponsor Class has initiated the sponsorship process (as defined in section 2(c) below); and
>> (d) who have not been released to the member of the Sponsor Class.
> (2) Sponsor Class: All individuals, anywhere in the United States, who
>> (a) have initiated the process to sponsor a member of the Minor Class

---

[10] The Third Amended Complaint contained no Count V, but it did have a Count VI, which simply requested habeas relief on behalf of the entire class and is accordingly not considered a substantive count.

15

        (b) as a Category 1 or Category 2 sponsor

        (c) by either (i) returning a family reunification packet to ORR or to an ORR-contracted caseworker or (ii) otherwise advising ORR or an ORR-contracted caseworker of their desire or willingness to sponsor the Minor Class member

        (d) to whom the Minor Class member has not been released.

[Dkt. Nos. 139, 149].

On September 16, 2019, the plaintiffs filed a Motion for Summary Judgment, [Dkt. No. 241], and on October 16, 2019, defendants filed a cross-Motion for Summary Judgment, [Dkt. No. 253].[11] On November 22, 2019, after a hearing on the parties' motions, the Court took both motions under advisement. Since then, the parties have filed numerous notices of supplemental authority and changes to ORR policy. For example, on March 12, 2021, defendants notified the Court that the April 2018 MOA, which enacted the information-sharing policy that formed the basis for many of plaintiffs' claims, was entirely rescinded. [Dkt. No. 321]. As a result of that change, on June 16, 2021, the Court granted plaintiffs' motion to voluntarily dismiss as moot all claims related to the MOA, which comprised all of Count III, as well as significant parts of Counts I, II, and IV. [Dkt. No. 331].

On June 17, 2021, the parties filed supplemental memoranda describing the outstanding issues remaining in the parties' cross-motions for summary judgment, after which the Court dismissed all counts except Count II, as the parties agreed that the sole remaining issue in this civil action is whether ORR's current reunification policy and procedures provide sufficient procedural due process protections. [Dkt. No. 341]. On March 24, 2022, the plaintiffs notified

---

[11] The Third Amended Complaint named as defendants both federal officials and the private parties managing the facilities where the named minor plaintiffs were held. Only the federal officials have moved for summary judgment; however, the non-federal defendants are only proper defendants for plaintiffs' habeas claim, which is no longer considered a substantive count. Therefore, this entire civil action will be resolved by the ruling on summary judgment.

the Court of the decision by the United States District Court for the Central District of California

in Lucas R. v. Becerra, No. CV 18-5741-DMG (PLAx), 2022 WL 2177454 (C.D. Cal. Mar. 11,

2022), which addressed similar procedural due process issues with ORR's reunification policies

and procedures. [Dkt. No. 340]. On April 29, 2022, the parties appeared for oral argument.

[Dkt. No. 345]. Following this hearing, the parties submitted supplemental briefing regarding

the preliminary injunction issued by the Lucas court that required ORR to change portions of its

Policy Guide. [Dkt. No. 352]. On June 23, 2023, the parties appeared for a status conference to

address the impact of the changes to the ORR Policy Guide as a result of the Lucas preliminary

injunction on this civil action. [Dkt. No. 355].

## II. DISCUSSION

### A. **Standard of Review**

Both parties have moved for summary judgment under Fed. R. Civ. P. 56. Summary

judgment is appropriate when "there is no genuine issue as to any material fact and . . . the

movant is entitled to judgment as a matter of law." Norfolk S. Ry. Co. v. City of Alexandria,

608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). A genuine dispute about a

material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury

could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d

323, 330 (4th Cir. 2012). Because the Court is considering cross-motions for summary

judgment, it must "consider and rule upon each party's motion separately to determine whether

summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Penn.

Mfrs. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

### B. **Analysis**

To establish a procedural due process violation, a plaintiff must show "that he had a

constitutionally cognizable life, liberty, or property interest[,] . . . that the deprivation of that

interest was caused by 'some form of state action,'" and "that the procedures employed were constitutionally inadequate." <u>Sansotta v. Town of Nags Head</u>, 724 F.3d 533, 540 (4th Cir. 2013) (citations omitted).  In determining whether the procedures employed were constitutionally inadequate, courts consider the private interests at stake, the "probable value, if any, of additional or substitute procedural safeguards," and the governmental interest implicated in imposing these safeguards.  <u>Incumaa v. Stirling</u>, 791 F.3d 517, 532 (4th Cir. 2015) (quoting <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)).

Plaintiffs contend that the process currently used by ORR to evaluate the ability of a sponsor to safely care and provide for a UC is constitutionally deficient because it risks erroneous denials and creates prolonged delays without sufficient procedural protections for UCs and potential sponsors.  Three courts have now held that previous iterations of ORR's reunification policy violated procedural due process, suggesting the viability of plaintiffs' concerns at the time they were initially pleaded in this civil action, <u>see</u> <u>Beltran v. Cardall</u>, 222 F. Supp. 3d 476, 489 (E.D. Va. 2016); <u>Santos v. Smith</u>, 260 F. Supp. 3d 598, 615 (W.D. Va. 2017); <u>Lucas R.</u>, 2022 WL 2177454, at *28.

On August 30, 2022, the District Court for the Central District of California issued a preliminary injunction ordering ORR to enact changes to its family reunification policies that, in large part, enact the remedies plaintiffs seek in this litigation.  <u>Lucas R. v. Becerra</u>, No. CV 18-5741-DMG (PLAx), 2022 WL 3908829 (C.D. Cal. Aug. 30, 2022).  ORR implemented these changes to its Policy Guide on October 27, 2022.[12]  Policy Guide § 2.  This injunction stemmed

---

[12] At oral argument on June 23, 2023, plaintiffs expressed concern that, because ORR only changed its Policy Guide in response to a preliminary injunction, should the <u>Lucas</u> court not enter a permanent injunction, ORR could once again change its Policy Guide to remove these improvements; however, since October 27, 2022, the ORR Policy Guide has included these

from the Lucas court's ruling on cross-motions for summary judgment, which raised a due

process challenge to § 2 of ORR's Policy Guide nearly identical to the challenge before this

Court.  Lucas R., 2022 WL 2177454.  In Lucas, the "unfit custodian" class, which was

comprised of "all minors in ORR custody . . . whom ORR is refusing or will refuse to release to

parents or other available custodians within 30 days of the proposed custodian's submission of a

complete family reunification packet on the ground that the proposed custodian is or may be

unfit,"[13] argued that ORR's procedures created a risk of erroneous denials and prolonged delays

for three reasons:

> First, most proposed sponsors and minors are not provided notice of a denial of a
> sponsor application and an opportunity to appeal the denial, with the assistance of
> counsel. Second, the lack of timeframe by which ORR must decide a sponsorship
> application results in prolonged detention. Third, Case Managers'[14] discretion to
> deny applications as "non-viable" and lack of evidentiary standard increase the
> likelihood that a minor remains in custody.

Id. at *2, *26.  The Lucas court found that these deficiencies in ORR's procedures created a risk

that minors would be deprived of interests in being free from institutional restraints and in family

reunification, and it ordered ORR to implement additional procedures to safeguard these

interests.  These additional procedures, already found by another district court to mitigate almost

identical concerns to those that plaintiffs have expressed in this civil action, now protect against

---

changes, and this Court must consider the procedural due process implications of the current
ORR Policy Guide.

[13] Although the class certified by the Lucas court only included minors, the relief it granted
changed the ORR Policy Guide itself, altering the rights of both minors and sponsors that are
members of the classes certified in this civil action.

[14] The plaintiffs in Lucas identified Case Managers as the decisionmakers who wielded too much
discretion within the process, whereas plaintiffs in this civil action identify FFSes and Case
Managers as possessing overbroad discretionary authority.  This difference is not material to the
due process analysis as FFSes oversee Case Managers, and both play a role in adjudicating
family reunification applications.

the risk of erroneous denials and prolonged delays, and, as such, provide plaintiffs with all the due process to which they are entitled.

      1.    <u>Constitutionally Cognizable Interests</u>

Plaintiffs argue that ORR's reunification process implicates two constitutionally cognizable interests. First, they contend that the UCs in the minor class have an "interest in being free from physical confinement," and, second, they contend that both the UCs and sponsors in the certified classes have an interest in "family unity." [Dkt. No. 242] at 47.

The defendants do not dispute that minors, just like adults, have a constitutional interest in being free from institutional restraints, <u>Schall v. Martin</u>, 467 U.S. 253, 265 (1984) ("[A] juvenile's . . . interest in freedom from institutional restraints . . . is undoubtedly substantial"); <u>see also</u> <u>Application of Gault</u>, 387 U.S. 1, 27 (1967); however, this "interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." <u>Schall</u>, 467 U.S. 253, 265 (1984). This qualification does not negate a minor's interest in being free from restraints, but, instead, relates to the balancing of the factors cited in <u>Mathews v. Eldridge</u>.

Additionally, both UC and sponsor class members have a cognizable constitutional interest in family unity. When the proposed sponsor is a parent, the Fourth Circuit has clearly stated that children have an interest in "be[ing] raised and nurtured by their parents," and the parent has an interest—"'perhaps the oldest of the fundamental liberty interests recognized by' the Supreme Court"—"in the care, custody, and control of their children." <u>D.B.</u>, 826 F.3d at 740 (citations omitted). The interest in family unity of Category 2 sponsors—non-parent relatives—is less clear; however, this Court has previously found that "[t]he family relationships captured in ORR's second-level category of would-be sponsors—siblings, aunts or uncles, grandparents, or first cousins, <u>see</u> Policy Guide § 2.2.1—are . . . constitutionally significant."

[Dkt. No. 60] at 33.  Despite defendants arguments to the contrary, Category 2 sponsors and the minor children seeking to be released to them have an interest in family unity because "[o]urs is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family.  The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition."  Moore v. City of East Cleveland, 431 U.S. 494, 504 (1977).[15]

Defendants further contend that a Fourth Circuit decision issued during the course of this litigation suggests that UCs and sponsors of any familial relationship do not have a liberty interest in family unity in the context of the reunification process.  [Dkt. No. 254] at 34–35.  In Reyna v. Hott, 921 F.3d 204 (4th Cir. 2019), the Fourth Circuit considered whether a transfer of detainees in the custody of Immigration and Customs Enforcement from a facility in Virginia to a facility in Texas without notice and an opportunity for a hearing violated the procedural due process rights of the detainees and their non-detained children who lived in Virginia.  Id. at 206; see also Reyna v. Hott, No. 1:17-cv-01192, 2018 WL 3551558, at *1 (E.D. Va. Mar. 20, 2018), aff'd sub nom. Reyna v. Hott, 921 F.3d 204 (4th Cir. 2019).  Under these facts, the Fourth

---

[15] Defendant cites only one decision from the Fourth Circuit that it claims "declin[ed] to extend [the] parent-child constitutional relationship to that of other family [members]."  [Dkt. No. 254] at 35 (citing Shaw v. Stroud, 13 F.3d 791, 805 (4th Cir. 1994)).  That opinion does not stand for that proposition, but, instead, held that the Fourth Circuit would not "recognize a substantive due process claim arising from the deprivation of the love and support of a family member," when a wife and children sued a police officer who shot and killed their husband and father.  Shaw, 13 F.3d 793–94, 805.  The court explained this was "because the Supreme Court has never extended the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally," not because one of the plaintiffs bringing suit was the wife of the deceased rather than the parent or child.  Id. at 805.  Under the facts presented in Shaw, the parent-child relationship was undoubtedly affected—it was terminated; however, the Fourth Circuit saw fit to not recognize a constitutionally protected liberty interest because of the nature of the government action, not the nature of the familial relationship.

Circuit was "unable to find a . . . due process right to family unity in the context of immigration detention pending removal." Id. at 210.  Although the plaintiffs cited "cases in the constitutional neighborhood of such a right," the court "found no precedent recognizing that there is a right to 'family unity' limiting detainee transfers" between detention facilities.  Id.  The court explained that recognizing a right to family unity in the context of immigration detention would be inappropriate because the inquiry would necessarily be "heavily subjective" as "there are virtually no objective criteria for assessing how strong the familial ties must be, how short the distance between family and detention must be, or how weak the countervailing governmental interest must be." Id. at 211.  Accordingly, the court found that a liberty interest in family unity in the context of immigration detention "does not exist," and that the plaintiffs' procedural due process claim "must . . . fail." Id.; see also Abdo v. Pompeo, No. BPG-17-1053, 2020 WL 2614773, at *6 (D. Md. May 22, 2020) ("[T]he Fourth Circuit and the other circuits which have addressed the issue have 'uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children.'") (citations omitted).  Although this civil action does not relate to the deportation or detention of noncitizen parents, defendants argue that Reyna applies and dooms plaintiffs' procedural due process claims.

Plaintiffs correctly respond that Reyna's conclusion does not apply to the family unity interests here. The court in Reyna was careful to couch its holding "in the context of immigration detention pending removal." Id. at 210.  By contrast, this civil action concerns an agency tasked with a child welfare mandate and directed to consider "the best interest of the child" when making placement determinations.  8 U.S.C. § 1232(c)(2)(A).  To be sure, UCs are in ORR care "by reason of their immigration status,"  6 U.S.C. § 279(b)(1)(C), but, throughout this litigation, ORR has emphasized that it holds itself out as a child welfare agency, not an immigration

agency.  See, e.g., [Dkt. No. 275] at 19 (acknowledging that "ORR's custody over the children in

its care is an altogether different species of government custody compared to the immigration

incarceration of adult aliens by DHS" and that "the differences between ORR custody and DHS

detention are significant for child welfare, clinical, and operational purposes.").  Additionally,

the Policy Guide itself provides the "objective criteria" that the Fourth Circuit found lacking in

Reyna because, through the proposed sponsor categories, ORR has already ranked familial ties

by closeness.  Most importantly, the Fourth Circuit has acknowledged that ORR reunification

proceedings "involve[] 'perhaps the oldest of the fundamental liberty interests recognized by' the

Supreme Court—'the interest of parents in the care, custody, and control of their children.'"

D.B., 826 F.3d 721, 740 (finding no substantive due process violation despite this interest, and

remanding to the district court to evaluate the procedural due process claim); see also Santos,

260 F. Supp. 3d at 612 (finding an "interest in family reunification" to be a "fundamental right

. . . clearly . . . impacted" by denying to release a UC to a proposed sponsor); Beltran, 222 F.

Supp. 3d at 482; Lucas R., 2022 WL 2177454, at *25.  The Court agrees with the reasoning of

Santos, Beltran, and Lucas, and finds that the interest of family unity is implicated by ORR's

reunification process as it applies to Category 1 and 2 sponsors, and finds that UCs and their

proposed Category 1 and 2 sponsors share a constitutionally cognizable interest in family unity.

      2.    <u>Deprivation of Interests</u>

      There is no dispute that ORR is a state actor, and that ORR's final decisions denying the

release of a UC to a proposed sponsor deprive the UC of his or her interest in being free from

restraint, and deny the UC and the proposed sponsor of their interests in family unity; however,

the parties dispute whether interim decisions by ORR during the reunification process which

23

result in prolonged detention of minors also create an unconstitutional deprivation of plaintiffs' interests before formal denials. See [Dkt. No. 254] at 37.

Plaintiffs argue that ORR decisions made throughout and in furtherance of the reunification assessment, including decisions to request more information from proposed sponsors, to conduct discretionary home studies or CA/N checks, and to elevate concerns to supervisors, are "interim denials" that constitute deprivations of plaintiffs' interests. This argument is unpersuasive. Although, "temporary, nonfinal" actions can constitute deprivations, Fuentes v. Shevin, 407 U.S. 67, 85 (1972), to do so they must actually deprive the individual of the cognizable interest. The decisions made by ORR throughout the reunification process are not deprivations because the act of ordering a home study or a CA/N check does not itself keep a UC in custody and away from his or her familial sponsors. Instead, it is the prolonged delays in the reunification process that can "raise[] due process concerns." Beltran, 222 F. Supp. 3d at 486; see also Santos, 260 F. Supp. 3d at 613–14 (finding a delay of 17 months between the filing of a reunification application and a final denial violated the due process rights of a plaintiff); Lucas R., 2022 WL 2177454, at *27 ("'[S]ignificant' and 'unexplained delay[s] in responding to [a proposed sponsor's] unification request' violate due process irrespective of other procedural defects.") (citing Santos, 260 F. Supp. 3d at 613–14). The deprivations of plaintiffs' interests can therefore occur not just when ORR makes a final determination denying a reunification application, but also before making a final decision if there are prolonged, unreasonable delays in releasing a minor.

      3.    Constitutional Adequacy of the Procedures

If a plaintiff establishes a deprivation of a constitutionally cognizable interest, the

remaining issue is whether the procedures used are constitutionally adequate.  Courts balance the

following Mathews factors to make this assessment:

> (1) the nature of the private interest that will be affected, (2) the comparative risk
> of an erroneous deprivation of that interest with and without additional or substitute
> procedural safeguards, and (3) the nature and magnitude of any countervailing
> interest in not providing additional or substitute procedural requirements.

D.B., 826 F.3d at 742 (quoting Turner v. Rogers, 564 U.S. 431, 444–45 (2011)).

> a.   Private Interests

Minors have a substantial private interest in being free from institutional restraints, even

if "children, 'unlike adults, are always in some form of custody' and do not have 'a right to come

and go at will[.]'" Lucas R., 2022 WL 2177454, at *14 (alteration in original) (quoting Reno v.

Flores, 507 U.S. 292, 302 (1993)).  Defendants suggest that this interest is less substantial for

minors located in less secure facilities,[16] pointing to the Lucas court's holding that the minor

plaintiffs' "private interests in freedom from physical restraint" were not implicated "for Class

Members who remain in non-secure shelters." Id. at *25.  The procedures at issue in this civil

action currently apply to all UCs, regardless of whether they are placed in secure or non-secure

facilities.  Because, as explained below, the Court finds that ORR's current procedures are

adequate for even those UCs held in secure facilities, it need not determine whether the due

process rights of UCs depends on the type of facility in which they are held.

Minors and sponsors in this litigation also have varying degrees of private interests in

family unity.  Plaintiffs concede that this interest is weightier for Category 1 sponsors than

---

[16] Secure facilities including juvenile detention centers, "staff-secure facilities," and "therapeutic staff-secure facilities," are used to house minors who pose a danger to themselves or others, pose a risk of escape, or otherwise require more attention from staff.  Lucas R., 2022 WL 2177454, at *5–*7.

Category 2 sponsors, [Dkt. No. 270] at 27; however, even if minors and sponsors have weaker

private interests when a family member who is not a parent or legal guardian seeks to sponsor a

child, they still retain interests that must be protected by procedures that comport with due

process.

       b.  Governmental Interests

      The Court must consider the government's interests "including the function involved and

the fiscal and administrative burdens that the additional or substitute procedural requirement[s]

would entail." Mathews, 424 U.S. at 335.  The Court finds the government's interests here are

also substantial.  Neither party disputes that, in its "parens patriae" role, ORR has an interest in

protecting the welfare of the UCs in making placement decisions.  By statute, ORR must

determine that a sponsor "is capable of providing for the child's physical and mental well-being"

before placing a UC with a sponsor.  8 U.S.C. § 1232(c)(3)(A).  The record reflects that ORR

intends to follow this statutory mandate.  For example, in her deposition, the previous ORR

Deputy Director at the time of discovery, Jallyn Sualog, stated that "child safety is paramount"

because "[o]nce [ORR] discharge[s] a child," it cannot change its mind, so it has "to make the

right decision as much as possible."  [Dkt. No. 254-4] at 242:2–19.  Concerns about child safety

are significant given evidence of incidents such as the trafficking of UCs by their assigned

sponsors in Marion, Ohio.  [Dkt. No. 231-2] at 369–70.  And, as a recent investigation conducted

by the New York Times shows, the concern about mistreatment of UCs after release remains a

legitimate governmental concern.[17]  As that article reported, UCs released by ORR across the

country have taken dangerous jobs in factories, which had in some cases been encouraged or

_____

[17] Hannah Dreier, Alone and Exploited, Migrant Children Work Brutal Jobs Across the U.S.,
N.Y. Times, (Feb. 25, 2023), https://www.nytimes.com/2023/02/25/us/unaccompanied-migrant-child-workers-exploitation.html.

even required by sponsors.  The potential exploitation of UCs by sponsors underscores the strong interest that ORR has in ensuring the safe release of children in its care.

Plaintiffs do not contest the government's interest in safe placement of UCs, but argue that the government also has an interest in prompt placement of UCs with familial sponsors, mirroring the private interest of UCs and sponsors in the timely release of UCs from ORR custody.  [Dkt. No. 242] at 51.  The plaintiffs correctly argue that ORR not only has a statutory mandate to consider the safety of UCs when making placement determinations, but it also has a mandate to make these placements "promptly." 8 U.S.C. § 1232(c)(2)(A).  This underscores what this Court has previously observed: "the private and governmental interests here converge to an extent."[18]  [Dkt. No. 60] at 34.

### c. Risk of Erroneous Deprivation

Finally, the Mathews balancing test requires courts to evaluate whether there is a "risk of an erroneous deprivation of the private interest through the procedures used[,] and the probable value that additional or substitute procedures would reduce that risk." Miranda v. Garland, 34 F.4th 338, 361 (4th Cir. 2022).  In spite of the extensive changes to ORR's Policy Guide and procedures, plaintiffs maintain that three changes to ORR's policy and procedures are constitutionally necessary to ameliorate a risk of erroneous denials or prolonged delays: (1) expanded notice and review rights after a formal denial of a sponsorship application; (2) expanded notice and review rights after delay in resolving a sponsorship application; and (3)

---

[18] For example, as the plaintiffs have argued, FBI background checks, visits to sponsors' homes, and CA/N checks can create delays in releasing a UC from ORR custody; however, the government compellingly argues that these steps are necessary to ensure that UCs are placed in safe homes.

consideration when making release decisions of the harm created by the continued custody of children in ORR care. [Dkt. No. 351].

i.     Notice and Review Rights for Denials

Plaintiffs argue that due process requires "extending the availability of the existing notice and review process for Category 1 sponsors who have been formally denied . . . to all class members," which would include Category 2 sponsors and minors with Category 1 or 2 proposed sponsors. Id. at 5. ORR has since amended the Policy Guide to provide Category 2 potential sponsors formal notice of denials of sponsorship applications and appeal rights of these denials, making this request moot. As for plaintiffs' request to expand notice and review rights to UCs, for the same reasons explained by the Lucas court, due process does not require extending the same formal notice to minors.[19] The Lucas court declined to require ORR to provide minors with the "full written notice" of denial that is provided to Category 1 and 2 sponsors because "[d]enials of sponsorship applications can be based on sensitive grounds, such as the criminal history of the sponsor or the sponsor's roommates, or other grounds that could cause distress to the minor, such as the sponsor no longer being willing to take custody of the minor." Lucas R., 2022 WL 2177454, at *27. In addition, because "[r]elease of such information directly to a minor or minors' counsel of record may infringe on the sponsor's privacy or cause unnecessary pain to all parties involved[,] . . . [s]o long as a minor and minor's counsel are notified of the denial and have the opportunity to request to inspect the evidence, minors' interests are sufficiently protected." Id. This Court agrees with this well-reasoned conclusion, and also

_____

[19] Although plaintiffs indicated that they were "encouraged" by ORR's extension of formal notice and appeal rights to Category 2 sponsors, they have never explicitly abandoned their argument that due process requires that "all class members" receive such formal notice and appeal. [Dkt. No. 354].

concludes that ORR does not violate a UC's due process rights by not providing the UC with a written notice of a formal denial.

Plaintiffs also seek review of denial decisions by a neutral arbiter "not involved in the reunification decision-making process either directly or in a supervisory role." [Dkt. No. 351] at 5–6; see also [Dkt. No. 270] at 34. The Policy Guide currently mandates review by either the "Assistant Secretary, Administration for Children and Families, or their neutral and detached designee." Policy Guide § 2.7.8. Even though the Assistant Secretary has a supervisory role in ORR's release program, the Lucas court found that ORR's review satisfied due process by "including review by a neutral factfinder who is not involved in the original denial." Lucas R., 2022 WL 2177454, at *26. This Court finds that the current ORR policy and procedures governing the review of formal denials are sufficient, and that due process does not require that an arbiter "such as an administrative law judge or an immigration judge" must provide review, as previously suggested by plaintiffs. [Dkt. No. 270] at 34.

ii.   Notice and Review Rights for Delays

Plaintiffs also propose making the following procedures available to sponsors and minors when a sponsorship application has been pending for 60 days:

    a. Notice provided to sponsor and child of the right to request a review at any point after a Category 1 or 2 sponsorship application has been pending for 60 days or more[20]; . . .
    b. An opportunity for children, sponsors, or their representatives to review evidence relevant to the reunification decision or lack thereof;
    c. An opportunity to present additional information or evidence in support of reunification and/or to mitigate any safety concerns;
    d. An opportunity to have a prompt written or oral hearing before a neutral individual not involved in the reunification decision-making process either directly or in a supervisory role; and

---

[20] Plaintiffs propose that ORR define an application as "pending" when a potential sponsor has been identified. [Dkt. No. 351] at 5 n.6.

e. Notice to the sponsor and child that they may be assisted or represented by counsel and/or an advocate of their choosing at any point in this process.

[Dkt. No. 351] at 5–6.

In essence, plaintiffs argue that due process requires ORR to provide a formal review process involving notice, the ability to review and present evidence, and the opportunity for a hearing after a sponsorship application has been pending for 60 days. Plaintiffs demand too much. As defendants have compellingly argued, "pre-decision hearings at rigid intervals" could lengthen a UC's time in ORR custody because it would require ORR staff to devote attention to the hearings, rather than the safe release of the UC. [Dkt. No. 248] at 44. During oral argument on June 26, 2023, the defendants further represented that this formal review process after 60 days could hamper the flexibility that ORR must have to ensure a minor's safe and timely release, and the plaintiffs themselves acknowledge the importance of this "needed flexibility." [Dkt. No. 351] at 6. The Court agrees that imposing a formal review process on ORR after 60 days could prolong a minor's release by requiring ORR to devote Case Manager or FFS time to the formal review and could impair ORR's flexibility to safely release minors.

The Lucas court found that instituting a 90-day review by ORR of pending sponsor applications would be sufficient to mitigate the concern about unreasonable delay raised by plaintiffs. It also determined that "[t]he need for ORR to maintain some flexibility over this complex process counsels against imposing any stricter administrative deadlines on a class-wide basis." Lucas R., 2022 WL 2177454, at *28. The Lucas court thoroughly considered the "the well-documented deleterious effects of prolonged detention on minors" and balanced this "against ORR's interest in conducting thorough investigations of potential sponsors." Lucas R., 2022 WL 2177454, at *27. Acknowledging that "[m]any delays are due to the potential sponsors' own dilatoriness or other factors outside of ORR control, e.g., closures of

30

fingerprinting locations during the COVID-19 pandemic," it reached the well-reasoned conclusion that a 90-day review of pending reunification applications would mitigate the risk of prolonged detention, with which this Court agrees. Id. at *27–*28. Additionally, minors and sponsors are not without recourse in instances of "egregious delay," as minors may petition for judicial review of their prolonged detention. Id. The Court finds that the 90-day review, now implemented in the Policy Guide, and the availability of judicial review in the case of prolonged delays sufficiently mitigates any risk of prolonged detention, and that not affording plaintiffs the right to notice and formal review at 60 days does not violate their due process rights.

The only justification plaintiffs provide for requesting a 60-day review, as opposed to the 90-day review ordered by the Lucas court is that the 60-day mark "is tied to the facts and classes at issue in this case." Id. To be sure, the classes initially certified here include minors who have been in custody for over 60 days and their potential sponsors, and, throughout the litigation, the parties have accordingly focused on the impact institutional custody can have on minors who have been held for 60 days or more. Nevertheless, the difference between providing review at 60 days or 90 days is not a discrepancy of a constitutional dimension, and plaintiffs have offered no evidence to show otherwise. To the contrary, the Lucas court articulated compelling reasons for why a 90-day review of pending applications was reasonable in light of other deadlines in the application process. For example, public records and sex offender registry checks expire 90 days after ORR receives them. Lucas R., 2022 WL 2177454, at *27. And the court acknowledged that this administrative review period considers "[t]he need for ORR to maintain some flexibility over [the] complex process" it administers, but, at the same time, reduces the risk that UCs will be forgotten in the system. Lucas R., 2022 WL 2177454, at *28. Plaintiffs primarily seek this shorter time limit to bring renewed attention to long-pending cases, and although plaintiffs want

this review to happen earlier, even they have acknowledged that they are "encouraged" by the change to the Policy Guide implementing the 90-day review. [Dkt. No. 354] at 1–2. The Central District of California found an internal review at 90 days constitutionally sufficient, and this Court agrees with that conclusion.

Moreover, the current ORR policy is actually more favorable to UCs than either the Lucas court's injunction or plaintiffs' proposal because it begins to calculate the 90-day period from when UCs first enter ORR custody. Policy Guide § 2.7.9. By contrast, the Lucas court ordered that the 90-day period start when the sponsorship application is submitted, Lucas R., 2022 WL 3908829, at *1. Plaintiffs have asked that the 60-day period begin at the time that a potential sponsor expresses an interest in sponsoring a UC. Although "ORR begins the process of finding family members and others who may be qualified to care for a[] [UC] as soon as the child enters ORR's care," Policy Guide § 2.2, there is no evidence in the record showing the average time it takes to identify and locate a potential sponsor, and it is highly likely that there could often be delays between the date that a UC is brought into custody and the date at which a potential sponsor expresses interest in having the UC placed in his or her care. Moreover, the plaintiffs expressed concern with beginning the 90- or 60-day period at the time a sponsorship application is submitted because, although ORR "expects potential sponsors to complete the [sponsorship application] within seven (7) calendar days of receipt," MAP at 7, potential sponsors can face barriers in submitting the applications within this timeframe. [Dkt. No. 351] at 13. In this respect, the current ORR policy grants more relief than what the Lucas court ordered and what plaintiffs request. And, this additional relief is meaningful because, if a sponsor is not identified until a UC has been in ORR custody for more than 30 days, the current ORR Policy Guide would provide a quicker internal review than even plaintiffs' 60-day proposal. Because

32

there is a clear deadline in place whereby ORR will review the detention of any UC in custody

for 90 days, the Court finds that ORR's process does not create a risk of undue delays, and due

process does not require the 60-day internal review requested by plaintiffs.

iii.   <u>Additional Assessment Criteria</u>

       Lastly, the plaintiffs want the Court to require ORR to "consider the harm to the child's

[well-being] of continued federal custody as a factor relevant to the child's best interests and the

sponsor's ability to provide for the child's welfare," and include this factor in its "Assessment

Criteria," the specific factors that ORR considers when evaluating a reunification application.

[Dkt. No. 351] at 8; Policy Guide § 2.4.1. The <u>Lucas</u> court did not consider this specific request,

and ORR has not changed its Assessment Criteria.

       The record contains substantial, uncontradicted evidence of the traumatic, adverse effect

on adolescent neurological development of prolonged custody in an institutional setting, <u>see,</u>

<u>e.g.,</u> [Dkt. No. 240-1] at 10 (neuroscientist explaining that adolescents held in custody over one

month in a state of uncertainty about the end of that custody experience "long-lasting damage in

the brain"). That legitimate concern must be balanced against the equally drastic permanent

injury a child may suffer if placed in the custody of unfit adults.[21]  ORR's statutory mandate

already requires it to promptly make the best decision to ensure a child's well-being when

making a placement decision. 8 U.S.C. § 1232(c)(2)(A). Adding this criterion would not add

anything to ORR's mandate and could possibly endanger a UC by causing an FFS to

insufficiently investigate a potential sponsor for fear that the investigation could prolong the

UC's time in custody.

---

[21] There is also a legitimate concern to ensure that a UC who might pose a danger to a sponsor or
the community was not prematurely released from ORR custody.

33

This litigation demonstrates the tension between plaintiffs' substantial private interests in being free from detention and prolonged family separation, and the government's equally substantial interest in ensuring safe placement of children who arrive in this country without a guardian. Because the prompt release of UCs is already mandated by statute, and because the inclusion of this factor could endanger the government's substantial interest in safely placing minors with sponsors, due process does not require ORR to include this factor in its Assessment Criteria.

### III. CONCLUSION

The differences between currently operative ORR policy and procedures and plaintiffs' proposed procedures do not support plaintiffs' claim that they are being denied procedural due process. Accordingly, for the reasons explained above, defendants' Motion for Summary Judgment will be granted, plaintiffs' Motion for Summary Judgment will be denied, and judgment will be entered in defendants'[22] favor by an Order to be issued with this Memorandum Opinion, which will close this civil action as the non-federal defendants were named solely to satisfy the custodial element for a habeas claim, and the habeas claim is no longer at issue in this litigation.

Entered this _29_ day of August, 2023.

Alexandria, Virginia

/s/ _____

Leonie M. Brinkema
United States District Judge

---

[22] The federal defendants who moved for summary judgment were Jonathan Hayes, Director of ORR; Jallyn Sualog, Deputy Director of ORR; Lynn Johnson, Assistant Secretary for the Administration for Children and Families, HHS; and Natasha David, ORR FFS. See [Dkt. No. 253]. Pursuant to Fed. R. Civ. P. 25(d), the officers' successors have automatically been substituted as parties where necessary.